LEVIN H. CAMPBELL, Circuit Judge.
 

 The following two opinions concern separate actions taken by the district court in a bankruptcy receivership proceeding. While we fully recognize that each must rise or fall on its own distinct facts, we find it convenient to announce both opinions together since they share a common background and are, to some degree at least, interrelated.
 

 No. 79-1511.
 

 The question in this appeal is whether the district court abused its discretion in denying applications by the alleged bankrupt, Alan H. Abrahams, to use for his personal benefit certain funds held by the bankruptcy receiver. As we believe the district court was neither obliged to entertain, nor authorized to grant, such applications, we affirm the order of the district court.
 

 The order under appeal was entered June 26, 1979 by the district court, sitting as a court of bankruptcy, reconfirming the court’s earlier decision to deny Abrahams’ requests for legal fees in his pending criminal prosecution and for subsistence payments to his family.
 
 [1]
 
 The matter arose on an unusual set of facts. In February 1978, an involuntary bankruptcy proceeding was instituted against appellant Abrahams and Lloyd, Carr & Co., a Boston-
 
 *884
 
 based commodities option firm that had allegedly engaged in fraudulent options sales on a massive scale. A receiver in bankruptcy was appointed pursuant to Bankruptcy Rule 201, and charged with responsibility to marshal the assets of the alleged bankrupts.
 
 [2]
 
 Learning that Abrahams and Lloyd, Carr maintained two large bank accounts in Bermuda, the receiver brought legal proceedings there seeking to have the money — about $1.75 million — -transferred to the receiver’s control. This effort met considerable resistance in the Bermudian legal system, sparked by Abrahams’ personal refusal to authorize the transfer or cooperate in bringing it about.
 

 On April 5, 1978, the receiver sought to have Abrahams held in contempt for failing to cooperate in having the Bermuda funds repatriated to the United States, as required by the Bankruptcy Act and by the district court’s injunctive order of February 3, 1978. An April 28, 1978 hearing on the contempt motion was adjourned to a lobby conference at which the district court judge, the receiver, Abrahams, and the United States attorney, among others, were present. No creditors, other than the United States, were represented at this conference. Abrahams and the receiver arrived at an agreement during the conference that Abrahams would authorize transfer of $1.5 million from Bermuda to the receiver, to be held in a segregated account in Boston. In exchange, the contempt motion would be dropped; the United States attorney promised not to use the settlement as evidence against Abrahams in criminal proceedings relating to his commodities option transactions; and the district judge indicated that he would be willing to “entertain” motions from Abrahams seeking to use part of the $1.5 million fund to maintain Abrahams’ family in their residence in Marblehead, Massachusetts, and to pay the counsel fees arising from Abrahams’ numerous legal difficulties.
 

 Abrahams did in fact take the steps necessary to effect transfer of the $1.5 million from his Bermuda banks to the receiver in Massachusetts. The creditors, however, objected strenuously when their legal representatives were first apprised of the nature of the purported compromise entered into by the receiver and the district court. After much discussion, a new and considerably narrower compromise was reached in July 1978 whereby the creditors agreed to permit $20,000 of the $1.5 million to be used as a retainer for Abrahams’ bankruptcy counsel and also to permit Abrahams to transfer an additional $40,000 from Bermuda to be used for his criminal defense and for support of his family. This compromise, unlike the earlier arrangement, was carefully spelled out in writing. It was approved by all principal creditors except the United States, which appealed to this court from the district court’s approval of the compromise over its objection. After a single judge of this court had refused to issue a stay pending appeal, the United States
 
 *885
 
 withdrew the appeal. This court thus never had occasion to pass on any issues concerning the compromise.
 
 [3]
 

 During the months that followed, Abra-hams made repeated requests for further allocations of money from the $1.5 million fund, in line with his asserted understanding of the agreement of April 28. None were granted. On May 7,1979, Abra-hams’ new counsel moved for a release of funds for legal fees and family support, claiming that his client was entitled, at the least, to have such a motion “entertained” by the district court. After a hearing, this motion was denied by order dated May 29. A reapplication by way of a memorandum of law was unsuccessful, and the district court reconfirmed its order on June 26.
 

 Appellant’s first argument, simply stated, is that the district court entered into a contract with him at the April 28 lobby conference whereby the court agreed to grant appellant’s reasonable requests for funds in consideration for appellant’s cooperation in having the $1.5 million brought up from Bermuda. There is no merit to this contention. The objects for which use of the funds was sought do not fall within any category expressly sanctioned in the Bankruptcy Act. A bankruptcy court ordinarily has no power to authorize payment of funds from the bankruptcy estate for the personal use of the alleged bankrupt.
 
 See Randolph v. Scruggs,
 
 190 U.S. 533, 539, 23 S.Ct. 710, 712, 47 L.Ed.2d 1165 (1903) (Holmes, J.);
 
 In re Orbit Liquor Store,
 
 439 F.2d 1351, 1354 (5th Cir. 1971);
 
 compare
 
 11 U.S.C. § 102(a)(1).
 
 [4]
 
 Even if the facts here would support a construction of the April 28 agreement as a contract between appellant and the district court, a matter we do not decide, any such contract would be void to the extent it purported to authorize judicial acts beyond the scope of the court’s power.
 

 If not as an enforceable contract, appellant urges us to uphold the April 28 understanding as a species of compromise of the receiver’s pending claim to the funds in Bermuda. Section 27 of the former Bankruptcy Act, 11 U.S.C. § 50, provides that:
 

 “The receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate.”
 

 The April 28 understanding, however, is not enforceable as a Section 27 compromise. Among other reasons for nonenforceability is the fact that the notice requirements of the Bankruptcy Rules were not met. Rule 919(a) provides:
 

 “On application by the trustee or receiver and after hearing on notice to the creditors as provided in Rule 203(a) . the court may approve a compromise or settlement.”
 

 Although Rule 203(a) provides that the court may, “for cause shown,” dispense with the required ten-day notice in the case of a hearing on approval of a compromise, the court here made no such order, nor was cause shown to dispense with the notice requirements, and other formalities, contemplated by Rule 919(a).
 
 See also
 
 11 U.S.C. § 94(a)(6). Particularly where principal creditors had been given no opportunity to consider or respond to it, the April 28 agreement, whatever it may have been, was not a valid compromise pursuant to Section 27. When brought to the creditors’ attention, they not only did not ratify the undertaking but instead objected vigorously, with the result that a different and far narrower arrangement was entered into.
 

 Finally, appellant argues that the July 14, 1978 written stipulation, pursuant
 
 *886
 
 to which $60,000 was made available to Abrahams’ family and attorneys, constituted an open-ended commitment by the creditors to permit Abrahams to have access to the remainder of the $1.5 million. This argument is frivolous. The July 14 stipulation was painstakingly drafted, as the record makes clear. By its terms, it was limited to authorizing payment of $60,000, two-thirds of which was to be brought in from Bermuda. The parties specifically stated that
 

 “it is understood by all parties to this transaction that the willingness of Petitioning Creditors to allow funds of Abra-hams in this amount to be disbursed in this manner ... is not precedent which will govern future applications of this type, all of which Petitioning Creditors shall be free to oppose if they see fit.”
 

 Abrahams’ counsel signed this document on his behalf. Nowhere does it indicate that the district court is authorized or empowered to make further payments to Abra-hams, nor is there any indication that the creditors waived their rights with respect to this matter. Moreover, we find nothing in the July 21 order of the district court approving this compromise that indicates it was intended in any way to constitute a continuing commitment to provide funds to Abrahams.
 

 Accordingly, the district court not only did not abuse its discretion in refusing to authorize payment of the funds sought, but we know of no basis upon which the district court could have been authorized to grant the requests Abrahams made in May 1979. The district court’s refusal to grant these requests was therefore indisputably correct, and we affirm the court’s order in No. 79-1511.
 
 [5]
 

 No. 80-1045.
 

 This appeal was taken by the United States from an order of the district court entered January 17, 1980 which, in essence, (1) directs Abrahams to take all necessary steps to transfer all funds presently held in Butterfield Bank, Bermuda, Account No. 544-7-04620, to the receiver or his agent; (2) directs Abrahams to sign all documents necessary for the receiver to obtain a full transcript of that account, certain other described accounts at the Butterfield Bank, and any other account on which the alleged bankrupt is signatory; and (3) orders the receiver, upon receipt of the funds, to post bail in the sum of $100,000 on Abrahams’ behalf in a criminal case pending against him before Judge Conner in the Southern District of New York, and to deposit the balance in the receiver's segregated interest-bearing account at a Boston bank.
 

 This order was entered following a district court hearing held on January 10,1980 attended by counsel for Abrahams; for the receiver; for the Tax Division, Department of Justice; for petitioning creditors New England Telephone, et al.; and for plaintiffs in a reclamation action being brought on behalf of customers allegedly defrauded by the alleged bankrupts.
 
 See In re Lloyd,
 
 
 *887
 

 Carr & Co.,
 
 614 F.2d 17 (1st Cir. 1980). As already indicated, see note 2
 
 supra,
 
 the United States, appellant herein, appears to be the principal creditor of the alleged bankrupts, with tax claims amounting to about $5.6 million, although the reclamation proceeding, if successful, might give rise to an even greater liability. The telephone companies have claims of just under $1 million and there are other trade creditors. While all of the latter were not represented at the January 10 hearing, ft seems to be generally agreed that all major creditors and potential creditors having an interest in the bankruptcy estate were present.
 

 Abrahams was then, as now, facing trial on a 50-count indictment for mail and wire fraud in connection with allegedly fraudulent sales of commodity options made by Lloyd, Carr & Co. employees on a national scale. Venue in this case had been transferred from Boston to Arizona, and eventually to the Southern District of New York to avoid the possible impact of prejudicial pretrial publicity. At the time of the January 10 hearing, Judge Conner in New York had apparently indicated some willingness to free Abrahams on $100,000 bail, although it was not until later that bail was actually set in this amount.
 
 [6]
 

 Abrahams, through his counsel, proposed to the district court in Boston that he be permitted to transfer what he represented to be all his remaining funds in Bermuda— about $207,000 — to this country, with half to go to the receiver outright and the other half to be posted for bail in New York. With some qualifications, the receiver endorsed the proposal, pointing out practical and legal difficulties he had encountered in securing a transfer to himself of the alleged bankrupts’ assets in Bermuda. The receiver asserted that a “compromise” of the estate’s claim against the Bermuda assets was desirable in order to avoid the expense and delay of further litigation as well as the risk that such litigation would be unsuccessful.
 

 As recounted by the receiver, his difficulties stemmed from Abrahams’ refusal to cooperate by personally authorizing the depository bank to transfer his funds to the receiver. As a result the receiver was obliged to bring legal proceedings in the Bermuda courts, and after almost two years these were still pending. Initially an order restraining Abrahams from transferring the funds had been obtained, but the issuing court had been persuaded to discontinue the injunction. The injunction was only reinstated after appeal, and then only by a divided court. The merits of the receiver’s claim to the funds were yet to be tried. The receiver pointed out the difficulty he had experienced in finding competent members of the small Bermuda bar to represent him in opposition to the local banks. One attorney had already been discharged for inadequate performance. Both because of the further legal expense that would be required to secure the funds without Abra-hams’ cooperation, and the uncertainty of success, the receiver felt that Abrahams’ proposal was in the best interests of the estate.
 

 The receiver’s endorsement of Abrahams’ proposal was qualified in two respects. First, he insisted that Abrahams be required to provide a full accounting of all monies in Bermuda over which he exercised any control, so that the receiver could assure himself that no assets of the estate were still remaining there. Second, the receiver insisted that all of the money brought in from Bermuda be placed in the receiver’s custody prior to any bail arrangement, so that Abrahams would have no
 
 *888
 
 opportunity to abscond with the funds in the event he appeared for trial and bail was refunded. Addressing the issue of what risk existed that the estate would lose the bail money due to a default by Abrahams, the receiver stated that it was his opinion, based on considerable personal contact with Abrahams, that he would not default. According to the receiver, Abrahams was convinced he would be acquitted at his New York fraud trial; the sole reason Abrahams desired bail was to assist in organizing his defense.
 
 [7]
 
 The receiver also maintained he felt there was a significant possibility that, even if Abrahams defaulted, part of the $100,000 would be salvaged for eventual refund to the estate by the district court in New York.
 

 No representative of any creditor spoke in support of the proposal at the January 10 hearing. The proposal was vigorously opposed by the United States in its status as tax creditor. The government emphasized the risk that Abrahams would default on his bail. The proposal was also opposed by the petitioning creditors, who relied on a written submission. Counsel for plaintiffs in the reclamation action focused his attention on ensuring that Abrahams, at a minimum, be required to provide records of his bank accounts in Bermuda, but also opposed the proposed arrangement generally as not in the best interest of claimants against the estate.
 

 A written stipulation memorializing the compromise proposal outlined by the receiver was filed with the district court on January 16, 1980, and was approved by order of the court entered January 17. The United States immediately moved for a stay of this order pending appeal, and a temporary stay was subsequently granted. In the meantime, pursuant to the written stipulation, Abrahams effected a transfer of the $207,-000 to the control of the receiver, who placed the funds in a segregated account previously established for the $1.5 million brought to Boston in early 1978.
 

 On this expedited appeal, the district court’s order approving the compromise is challenged by the United States, by the petitioning creditors, and by the Commodity Futures Trading Commission as amicus. Subsequent to oral argument, we requested that the receiver file additional material concerning the status of the litigation in Bermuda prior to the January 10 hearing, and such material was duly filed. From this material, principally judicial opinions of the Bermudian courts and papers filed in the Bermuda litigation, it appears that the principal barriers to recovery in Bermuda were created by the Bermudian courts’ uncertainty as to the status of an American bankruptcy receiver, and a misapprehension on the part of those courts that the receiver was more concerned with enforcement of criminal sanctions against Abrahams than with the recovery of the bankruptcy assets. The receiver gave as his opinion, based on consultation with counsel in Bermuda, that the chances for success had the matter been litigated to final judgment were no better than 50 percent. Both the United States, as tax creditor, and the petitioning creditors have since filed responses to the receiver’s materials, arguing on the basis of those materials (which were not presented in the district court), that the legal posture of the receiver’s Bermuda case was more hopeful than represented, and restating their opposition to the compromise. Counsel for the creditors asserts that an eventual adjudication of bankruptcy by the district court here — an event which he claims to be inevitable and feels has been unnecessarily delayed — would have greatly improved the chances for success in Bermuda.
 

 I.
 

 While there is some initial plausibility in the district court’s order, which secures
 
 *889
 
 Abrahams’ cooperation in disclosing and turning over the proceeds in the Bermuda bank accounts in exchange for the receiver’s posting of $100,000 bail in Abrahams’ federal criminal case in New York, we do not believe the order can be upheld.
 

 First, we state the obvious: no section of the Bankruptcy Act authorizes the payment of bail for an alleged bankrupt, and, as observed in the previous case, it is well settled that payments designed to benefit the bankrupt personally may not be made out of the bankruptcy estate. Considerations as to Abrahams’ alleged constitutional and statutory rights to bail in the Southern District of New York are, of course, irrelevant in the bankruptcy proceeding. The presiding judge in the criminal case, Judge Conner, has exclusive responsibility with respect to bail, subject to appropriate appellate review in the Second Circuit. It is up to Judge Conner to determine the conditions of release, and he may, of course, adjust any bail order to defendant’s available means. A bankruptcy court has no duty to provide the bankrupt with the means for release on bail; to the contrary its duty is to marshal and conserve the assets. The only relevance to the present bankruptcy proceeding of Abrahams’ bail proceeding in New York is the extent to which the possibility of his flight might jeopardize the $100,000 security the receiver has been ordered to post. In that regard, we agree with appellants that the economic danger, while obviously impossible to calculate precisely, has to be regarded as substantial in Abrahams’ case.
 
 See United States v. Abrahams,
 
 575 F.2d 3 (1st Cir.),
 
 cert. denied,
 
 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978) (Abrahams’ unique history and circumstances held to justify his pretrial detention without bail).
 

 Since there is no direct authority for using bankruptcy funds for bail, the district court’s authority here, if any, must come from the compromise provision, quoted in our opinion in No. 79-1511, namely Section 27 of the Bankruptcy Act, 11 U.S.C. § 50. Pointing to the difficulties Abrahams’ lack of cooperation has created in Bermuda, and the danger, said to be as high as 50 percent, that the receiver might ultimately not prevail in litigation designed to extract Abra-hams’ $207,000 from local banks, the receiver takes the position that the
 
 quid pro quo
 
 obtained in return for risking $100,000 of estate funds to secure Abrahams’ bail reflects a fair compromise. Not only has the estate now secured the $207,000 — it has also received, with Abrahams’ cooperation, the transcripts of his financial dealings with certain Bermuda banks. This information will assist the receiver in closing out his responsibilities to determine and collect assets in Bermuda, and it may also assist the reclamation plaintiffs in tracing funds in their pending action against the bankrupts.
 

 There are two principal factors, however, which militate against acceptance of the arrangement as a valid Section 27 compromise. First, we have found no precedent for judicial approval of a compromise founded simply on the alleged bankrupt’s willingness — by way of supposed compromise — to do only what the Bankruptcy Act requires him to do. Second, we have found no precedent for a compromise of this nature actively opposed by the major creditors and affirmatively approved by none.
 

 II.
 

 We first address the enforceability of a purported compromise based on the bankrupt’s agreeing to cease obstructionist tactics that violate the Bankruptcy Act. Section 7(a) of the Bankruptcy Act, 11 U.S.C. § 25(a) states in part,
 

 “The bankrupt shall . (2) comply with all lawful orders of the court; (5) execute and deliver to his trustee [in this case, receiver] transfers of all his properties in foreign countries.”
 
 [8]
 

 The district court, on February 3, 1978, in ordering the receiver to take custody of all the property of the bankrupts, wherever
 
 *890
 
 situated, restrained all persons from interfering with the bankrupts’ property — an order which would control the bankrupts as well as others.
 

 The well-settled rule in the field of contracts has long been that performance of a pre-existing legal duty that is neither doubtful nor subject to honest and reasonable dispute is not valid consideration where the duty is owed to the promisor, or to the public at large. Restatement of Contracts § 76(a) (1932);
 
 Pittsburgh Testing Laboratory v. Farnsworth & Chambers Co.,
 
 251 F.2d 77 (10th Cir. 1958);
 
 United States v. Westmoreland Manganese Corp.,
 
 134 F.Supp. 898, 910 (E.D.Ark.1955),
 
 aff’d,
 
 246 F.2d 351 (8th Cir. 1957); 1A Corbin on Contracts § 175 (1963);
 
 see United States v. Bridgeman,
 
 173 U.S.App.D.C. 150, 161, 523 F.2d 1099, 1110 (D.C.Cir.1975),
 
 cert. denied,
 
 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976);
 
 Morrison Flying Service v. Deming National Bank,
 
 404 F.2d 856, 860 (10th Cir. 1968),
 
 cert. denied,
 
 393 U.S. 1020, 89 S.Ct. 628, 21 L.Ed.2d 565 (1969). The policy underlying this rule is to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do.
 
 See
 
 Corbin,
 
 supra,
 
 § 183. Certain exceptions are recognized to the general rule in cases where the circumstances indicate that the policy of deterring extortion is not applicable, such as the case of the contractor who encounters “extraordinary and unforeseen difficulties in the performance of the subsisting contract.”
 
 Pittsburgh Testing Laboratory v. Farnsworth,
 
 251 F.2d at 79.
 
 See also
 
 Restatement of Contracts § 76, ill. 8. In such cases, the promise to pay a larger sum for performance of the existing contract will often be enforced.
 
 Id.
 

 Abrahams is in no position to claim the benefit of any such exception. He cannot argue that his duty under the Bankruptcy Act to remit all funds under his control is “doubtful” or that there is an “honest and reasonable dispute” regarding this duty. Neither is there any circumstance rendering performance of his duty difficult or impossible; Bermuda law erects no obstacle to Abrahams’ directing the funds to be sent to the receiver. Abrahams’ affirmative obligations are governed by United States law, not Bermuda law.
 

 Approval of this compromise could have much the same effect as would recognition of a contract based on performance of a pre-existing legal duty. It places the bankrupt in the position of being rewarded for contravening the bankruptcy laws of the United States. All other cases we have found where bankruptcy compromises were approved have involved some colorable claim by the bankrupt, or someone else, to the property involved.
 
 See, e. g., In re Goldman,
 
 241 F. 385 (E.D.Pa.1917);
 
 In re Kranich,
 
 174 F. 908 (E.D.Pa.1909). While courts have often sanctioned compromises which confer pragmatic benefits, they have drawn the line at increasing the assets of the estate by means of agreements thought to encourage unfair or criminal methods.
 
 See, e. g., In re Rosenblatt,
 
 153 F. 335 (E.D.Pa.1907),
 
 aff’d sub nom. Mulford v. Fourth Street National Bank,
 
 157 F. 897 (3d Cir. 1907). The present compromise may encourage bankrupts situated as is Abrahams to refuse to comply with their legal duties. While we do not say that compromises of the present nature may never be approved, whatever the advantage to the estate, we think they are heavily disfavored on grounds of public policy, and should be approved only upon a showing of clear benefit to the estate and the absence of any realistic available alternatives.
 

 A showing of this type was not made here. At the hearing in the district court, the receiver’s files concerning the Bermuda litigation were not tendered.
 
 [9]
 
 Now that
 
 *891
 
 they are in our possession, we do not think they reflect such heavy burdens upon the receiver or such signal dangers to the estate as to indicate that continued litigation in Bermuda was an unrealistic alternative. Bermuda law would apparently recognize the right of a trustee in bankruptcy to take title to the bank accounts; the problem there stemmed from the fact that the receiver in bankruptcy was originally an equity receiver appointed because of the bankrupts’ alleged fraudulent practices. The Bermuda courts balked at transferring title to one thought to have been appointed to enforce the penal laws of the United States. They failed to recognize, partly through the fault of the receiver’s original Bermuda counsel, that what had started as an equity receivership had been transformed into a bankruptcy proceeding, conducted solely on bankruptcy grounds.
 

 In so saying we do not necessarily question the receiver’s judgment that, on balance, the compromise offered more to the estate than it would cost. Most experienced lawyers would agree that a bird in the hand is worth an ongoing — or as the receiver ’said, “endless” — law suit. But where as here a settlement rewards a bankrupt for his contumacious refusal to comply with the Bankruptcy Act itself, more is required than a simple showing of marginal benefit. Public policy forbids a settlement of this character without, at least, a powerful showing of such potential detriment to the estate that no other course is reasonably available.
 
 See In re Van Camp Products Co.,
 
 95 F.2d 206, 209 (7th Cir.),
 
 cert. denied,
 
 305 U.S. 605, 59 S.Ct. 65, 83 L.Ed. 384 (1938).
 

 III.
 

 We are also concerned by the absence of creditors’ support — and by the strength of creditor opposition. A much quoted statement of the standards by which a proposed compromise is to be judged is found in
 
 Drexel v. Loomis,
 
 35 F.2d 800 (8th Cir. 1929).
 
 See, e. g.,
 
 2A Collier’s on Bankruptcy ¶ 27.04 at 1092; 2 Remington on Bankruptcy § 1161. Along with factors such as probability of success, the difficulties of collection, the complexity of the litigation involved and the inconvenience and expense attending it, emphasis is placed upon
 

 “d. the paramount interest of the creditors and a proper deference to their reasonable views in the premises.”
 

 The views of creditors are, of course, not controlling upon the receiver. See 2A Collier’s,
 
 supra,
 
 ¶ 27.03 at 1090. No case has come to our attention, however, where a compromise has been imposed without the support of a single creditor and over the active opposition of the major creditors.
 

 Appellees argue that the United States has divided loyalties — that while it represents itself as a civil tax claimant, it cannot divest itself of its sometime role as criminal prosecutor. According to this argument, the United States is simply trying to prevent Abrahams from being freed on bail. But this explanation does not make it clear why the petitioning creditors have opposed the compromise, nor why the reclamation plaintiffs have opposed it, nor why no creditor whatever has expressed support for the compromise. If the compromise was manifestly in the best interest of the estate, we think this would be apparent to at least some of the creditors and their counsel.
 

 
 *892
 
 To be sure, some of the lack of support may be due to the suddenness with which the matter was brought forward. No change of heart, however, has since come to our attention. We recognize the reclamation plaintiffs were not vociferous in their denunciation of the proposal, nor did they appeal the court’s order approving it. And the petitioning creditors did not appeal, though they have filed briefs registering vigorous support for the United States’ opposing position and strong opposition to the receiver’s position. Whatever can be discerned from the foregoing, however, it is plain that were we to approve the district court’s order, we would be endorsing an arrangement, highly questionable in terms of public policy, without any affirmative indication in the record that a single creditor was persuaded that it was in the best interest of the bankruptcy estate. Under the circumstances we believe the district court’s order to be in excess of its authority.
 

 Our action leaves the $207,000 in the hands of the receiver, where, under the bankruptcy law, it belongs (and of course must stay, at least pending adjudication of the bankruptcy petition). In remitting the funds, the bankrupt did no more than the law required; while he did so after entry of the district court’s order, he was represented by counsel and was well aware that interested parties had up to 60 days within which to appeal to this court, with the possibility that the order might be reversed. We see no moral obligation, much less legal authority, for disturbing the present custody or status of the funds in whole or in part.
 

 The order of the district court in No. 80-1045 is hereby vacated except insofar as it is to be construed as directing the receiv-» er to retain all funds received from any of the listed Bermuda accounts as a part of the assets being held in the bankruptcy receivership.
 

 So ordered.
 

 [1]
 

 . We disagree with appellees’ contention that Abrahams’ notice of appeal was untimely filed. Under Fed.R.App.P. 4(a), a party has 30 days in which to file a civil appeal, unless the United States is a party to the proceeding, in which case the time limit is 60 days. Here, Abrahams filed his notice of appeal July 31, 1979, more than 30 days but less than 60 days after the June 26 order from which he appealed. While it is true that the United States did not file an opposition to appellant’s memorandum seeking to alter the district court’s earlier May 29 denial of funds, the United States has been involved in this particular controversy from the outset, and is a present party to this appeal. While the mere fact that the United States was a tax creditor in a civil bankruptcy proceeding would not, by itself, assure that the 60-day limit would be appropriate,
 
 see
 
 9 Moore’s Federal Practice '' 204.10 at 926, the government’s participation here was sufficiently active for Abra-hams to invoke the 60-day limit of Rule 4(a). Appellees also argue that the critical order was that issued May 29 rather than June 26 and that Abrahams should have taken his appeal from the former. While the issue is close, we are inclined to read the earlier order, which was entered without prejudice, and was expressly made subject to modification after receipt of memoranda from the parties, as non-dispositive (or at least as not so obviously dis-positive as to have necessitated an appeal at that time in order to preserve the issue now before us).
 

 [2]
 

 . The receiver, Walter McLaughlin, Sr., had previously been appointed equity receiver in a proceeding to enjoin Lloyd, Carr from various alleged fraudulent practices.
 
 Commodity Futures Trading Commission v. Carr,
 
 No. 77-371-T (D.Mass.). Abrahams, using the name James Carr, was alleged to be a principal in Lloyd, Carr’s activities.
 

 McLaughlin’s appointment as bankruptcy receiver, pursuant to Section 2a(3) of the Act, 11 U.S.C. § 11(a)(3) and Bankruptcy Rule 201, would seem to have superseded his status as equity receiver. As bankruptcy receiver, his principal duty is to preserve the estate and protect the interest of creditors pending adjudication of the petitions in bankruptcy.
 
 Id.
 

 The petitions for involuntary bankruptcy filed against Lloyd, Carr and Abrahams on February 1, 1978 alleged various acts of bankruptcy as defined under the Act, including the earlier placing of the firm into receivership by the district court, and the transfer of a large sum of money to Bermuda for the purpose of disadvantaging creditors. We are informed that creditors’ claims against the alleged bankrupts now include some $5.6 million claimed by the United States for unpaid taxes, and at least $2.8 million sought by other creditors. In addition, a class of allegedly defrauded customers of Lloyd, Carr are seeking $25 million from the estate by way of a reclamation suit. The receiver, commendably, has so far recovered about $5 million in assets of the estate. For reasons which do not clearly appear, the adjudication proceeding has yet to take place; this delay is a major source of complaint by the petitioning creditors, principally a group of telephone companies claiming some $973,000.
 

 [3]
 

 . Reference has mistakenly been made in the current proceedings to the brief unpublished opinion issued by a judge of this court declining a stay as if it were a final pronouncement of the Court of Appeals. This it was not. The court’s focus when acting on a stay petition is necessarily hurried, tentative and incomplete. Often, only one judge, not three, is involved.
 

 [4]
 

 . Although the Bankruptcy Act of 1898 has been superseded, we apply to these transactions the law as it existed at the time they occurred, Pub.L.No. 95-598, § 403(a), 92 Stat. 2549 (1978), and all citations are to the then-existing statutes.
 

 [5]
 

 . We recognize that concern has been expressed throughout this controversy that failure to award funds to Abrahams, or else to rescind the transaction and return the $1.5 million to Bermuda, would be “unfair” to Abra-hams, since he acted in “reliance” upon the April 28 arrangement. Abrahams, however, at no time took, or agreed to take, any action which he was not already obliged by law to perform. At all times, he has been under an absolute duty to assist the receiver in marshall-ing the assets properly includable in the bankruptcy estate, wherever they were located.
 
 See
 
 11 U.S.C. § 25(a)(2), (5). Because Abrahams was already in jail, and as a practical matter immune to fines, he may have felt he could afford to flout the usual contempt remedies available to the district court. Only because of certain technical aspects of Bermudian law was he able to resist the receiver’s efforts to have funds transferred from that jurisdiction by legal process. Abrahams cannot complain of having done what in fact the Bankruptcy Act required him to do. If Abrahams, indeed, had expectations of any sort flowing from the April 28 understanding, they have been more than met by the provision of $60,000 under the July 14 stipulation, in return for which Abrahams only complied with his manifest legal responsibilities. Whether even that limited compromise, had it been fully contested on appeal, would have been upheld we need not decide; clearly the informal and incomplete arrangement he now seeks to invoke, being beyond the power of the district court to make binding, could give rise to no legitimate expectations.
 

 [6]
 

 . We understand from counsel that Judge Conner is aware of the order being appealed from. We also understand he is willing to accept the receiver’s posting of $100,000 security even though, of course, if Abrahams defaults it will be the creditors and defrauded customers, not Abrahams himself, who stand to lose the security. There is indication in the record that Judge Conner may have felt Abrahams’ incentive to flee would be reduced if all his known remaining funds in Bermuda, consisting of something in excess of $200,000, were transferred to the receiver. The extent to which a particular bail arrangement may or may not serve as an effective deterrent to flight is, of course, entirely up to the New York court, which has control of the criminal proceedings, and not ourselves.
 

 [7]
 

 . Lest there be any thought that Abrahams is the garden variety defendant or bankrupt, we refer to our opinion in
 
 United States v. Abrahams,
 
 575 F.2d 3 (1st Cir.),
 
 cert. denied,
 
 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978), which recounts something of his background. We do not cite to this case to indicate that we necessarily disagree with other, more optimistic evaluations of Abrahams but merely to indicate that, to say the least, his reliability is debatable.
 

 [8]
 

 . It is not disputed in this case that the receiver, “for present purposes, has all the rights and remedies that a duly qualified trustee in bankruptcy would have.”
 
 National Oats Co. v. Long,
 
 219 F.2d 373, 375 (5th Cir.),
 
 reh. denied,
 
 220 F.2d 745 (5th Cir. 1955).
 

 [9]
 

 . In terms of benefit to the estate, the key question confronting the district court was obviously the likelihood of success in the Bermuda litigation, as well as the probable cost if the suit went forward. Without in any way questioning the judgment of the receiver, a distinguished attorney and former chief justice in the state court, we think this was an issue requiring in-depth analysis and findings by the district court premised upon a full record and
 
 *891
 
 considered responses by the creditors. The receiver’s oral conclusions were not enough.
 
 See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
 
 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968):
 

 “There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.”