In the Matter of NUGELT, INC. t/a Alyson's Restaurant, Debtor.

In re MYBEV ASSOCIATES, Debtor.

In re Michael MOSKOWITZ, Debtor.

Bankruptcy Nos. 88–493, 88–297 and 88–325.

United States Bankruptcy Court, D. Delaware.

June 16, 1992.

James McC. Geddes, Jeffrey Welch, Philip Trainer, Jr., Wilmington, Del., for First Federal Sav. Bank (of Delaware).

Kevin Callahan, Philadelphia, Pa., for Office of the U.S. Trustee.

Peter J. Walsh, Wilmington, Del., for NuGelt, Inc. t/a Alyson's Restaurant and Mybev Associates.

Thomas D. Runnels, Newark, Del., for Michael Moskowitz.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

First Federal Savings Bank (of Delaware) and the United States Trustee have moved for the conversion, dismissal, or appointment of a trustee in three related Chapter 11 cases: NuGelt, Inc., Mybev Associates and Michael Moskowitz. The court held a three-day hearing on these motions in March. Post-trial the United States Trustee argued that dismissal is the only appropriate remedy. The court agrees.

### I. FACTS

Michael Moskowitz is the president and sole shareholder of NuGelt, a Delaware corporation. NuGelt operates two restaurants, one on the Kirkwood Highway in Wilmington and the second in Newark. Mybev is a partnership originally comprised of NuGelt, Michael Moskowitz and his former wife Beverly Moskowitz. Today the sole partners are Michael and NuGelt. Mybev holds title to the land the Kirkwood Highway restaurant occupies. Michael and Beverly held title to a nearby lot on Logan Lane used for employee parking. Carolyn Moskowitz, neé Durbin, is Secretary and Vice President of NuGelt. She was Vice President of NuGelt at the time of the loan transactions with First Federal. She is now married to Michael.

In March of 1987 First Federal approved a $1,850,000 mortgage loan package consisting of a $1,600,000 term loan to Michael and Beverly Moskowitz and a $250,000 loan to NuGelt in the form of a letter of credit or a line of credit and an equipment loan

and a line of credit. The monthly payment for the term loan alone began at $8,889 and would have increased during the 15–year payback period.

The loan was secured by a first mortgage lien on the Kirkwood Highway restaurant real estate, allegedly including the Logan Lane parcel held by Michael and Beverly Moskowitz. (But only a mortgage lien on the property held by Mybev was actually conveyed at the closing.) NuGelt provided the lender with an MAI appraisal report: the two parcels were valued at $2,500,000 and the restaurant machinery and equipment at $500,000.

Michael Moskowitz accepted the loan on behalf of NuGelt. Michael, Beverly and Carolyn also accepted the terms individually and so are personally liable on the note. NuGelt was the corporate guarantor for Michael and Beverly's term loan; it executed a promissory note to First Federal secured by NuGelt's equipment, inventory, contracts and accounts receivable.

At closing, the Logan Lane parking lot was not included in the mortgage documents. The parties debate the scope of the land mortgage (First Federal claims an equitable interest in the Logan Lane lot), but that is not relevant to the court's decision today.

Mybev filed under Chapter 11 on June 2, 1988. Michael Moskowitz filed under Chapter 11 on June 14, 1988. NuGelt filed under Chapter 11 on September 20, 1988. There were related concurrent Chapter 11 filings in this court which were long ago discharged or converted. The business debtors are represented jointly; the individual debtor has separate counsel.

The Debtors' petitions listed the following assets and liabilities. NuGelt: assets of $3,500,000 and liabilities of $9,600,000 of which $3,500,000 is secured debt divided among three creditors ($14,264 cash on hand). Mybev: assets of $3,000,000 and liabilities of $7,300,000 divided between two secured creditors. Moskowitz: assets of $340,000 and liabilities of $9,600,000; $447,750 of which is secured debt and $9,100,000 unsecured.

From the beginning, litigation has been heavy in these proceedings. First Federal's post-trial memorandum lists eight adversaries, stay motions, and motions in the main cases currently pending before the court. The United States Trustee has been active in these cases as well. Most recently there have been Motions to Convert in Mybev (filed December 2, 1991) and NuGelt (filed February 10, 1992) and a Motion for an Order Fixing Deadline for Filing Plan of Reorganization and Disclosure Statement in Moskowitz (filed July 16, 1991). Only the motion in Mybev was noticed for hearing on March 6, 1992, but the United States Trustee asked to join in First Federal's motions as well.

NuGelt and Mybev filed disclosure statements and plans of reorganization on December 29, 1989. First Federal objected to the disclosure statements. Hearings were held on February 2 and 7, 1990. There was a two day valuation hearing in April of 1990 to determine the amount of First Federal's secured claim in connection with its objection to the Debtors' disclosure statement. A decision on the exact underlying value of First Federal's collateral is pending. Michael Moskowitz also filed a disclosure statement and plan on December 29, 1989.

In October of 1989 First Federal and NuGelt entered into a stipulation under which NuGelt would pay First Federal $10,000/month commencing November 1, 1989. The payments were to continue until confirmation, dismissal or conversion, or the court scheduled a hearing on First Federal's motion to convert, dismiss or appoint a trustee (which the court did on January 27, 1992). The court approved the stipulation on October 23, 1989. The payments were made as scheduled until August 1991 when NuGelt purposely stopped, without prior court approval or notice.

First Federal responded with a motion for rule to show cause why the Debtors should not be held in contempt for violation of this court's October 23, 1989 Order. At the January 27, 1992 hearing the court deferred ruling on the motion, preferring to combine the motion with an update on the nearly two-year old expert valuation testimony for the 1990 valuation motion;

First Federal's renewed motions to convert, dismiss or appoint a trustee in the cases; and the United States Trustee's motion to convert, dismiss or appoint a trustee in Mybev. Testimony was presented on March 6, 10 and 11 with post-trial briefing completed on April 2, 1992. This opinion follows.

## II. DEBTORS' POST–PETITION OPERATIONS

### A. *The Debtors' Monthly Reports*

Chapter 11 debtors are responsible for filing monthly operating reports with the United States Trustee. Mybev has interpreted this requirement to be purely a formality; "a useless gesture." Tr. at 6. This is allegedly the result of Mybev's status as a title holding company; its fortunes rise and fall with NuGelt's. Accordingly, there are no monthly reports available to chart Mybev's progress through its Chapter 11 case. Similarly Moskowitz has also stopped filing monthly reports as they were allegedly duplicative of NuGelt's. Tr. at 69. The court does not understand why a corporation and an individual's monthly statement of receipts and disbursements should be identical, but there it is: only monthly reports are available for NuGelt.

NuGelt's monthly operating report itemizes two large categories of disbursements under "Other operating expenses paid": "Wage Attachments" (12b.) and "Share holder distributions" (sic) (13b.). There was extensive testimony at trial by the Debtor's principals as to what these monies went to, and that will be discussed in some detail *infra*. Suffice to say now that these are all checks written on the DIP account and signed by Michael or Carolyn Moskowitz, the two signatories. The wage attachments total approximately $62,686.80 through February 1992. The shareholder distributions total approximately $327,000 through February 1992. The Monthly Reports list "NONE" under salaries of officers and owners.

NuGelt's monthly report for January 1992 reveals total cash sales of approximately $10,500,000 since filing its Chapter 11 petition.

### B. *Testimony at Trial*

The strongest testimony supporting First Federal's motion to convert or dismiss focused on the DIP account and what use Michael and Carolyn Moskowitz made of it. Mr. Moskowitz testified that his personal living expenses are paid for by NuGelt and "[i]t's been done for 40 months." Tr. at 20. His monthly shareholder distribution (itemized on NuGelt's operating report and currently averaging $10,000/month) varies with his personal expenses each month. *Id.* These personal expenses include credit card bills (the card is in Carolyn Moskowitz's name but admittedly mutual expenses are charged to it) (Tr. at 23) and all payments and expenses relating to the two Porsches Carolyn and Michael drive (Tr. at 25–28). The car payments alone are $2,100/month. Tr. at 52. All expenses arising from Michael and Beverly's divorce such as alimony payments and the personal legal bills of the adversaries are also paid directly by NuGelt but these are accounted for as "wage attachments." Tr. at 24–25.

Carolyn's testimony supported Michael's, but as corporate secretary she could supply more financial details. First Federal was interested in how Michael decides how much to draw each month as his shareholder distribution. Q: "Do I understand that you merely add up all your personal bills and then you write a check to Mr. Moskowitz to cover all those bills every month?" Tr. at 53. The answer was that it is not quite that simple: all large personal expenses are paid by NuGelt; Michael receives only $3,000–3,500 each month to deposit in his personal account for smaller expenses. *Id.* Q: "What accounting constraint or bookkeeping constraint are you aware of that would prevent Mr. Moskowitz from paying his own bills rather than having NuGelt pay his bills?" A: "It's just an accounting procedure that we have followed for many years." Tr. at 54. Whether the personal expenses are paid directly by NuGelt or indirectly via a check drawn on Mr. Moskowitz's personal account it is accounted for on the NuGelt monthly report as a "shareholder distribution."

Mr. Moskowitz is not on salary (*Id.*), and there is no attempt to budget Mr. Moskowitz's personal expenses that NuGelt pays (and of course Mrs. Moskowitz's as well because she is not on salary either). Tr. at 54–56.

Carolyn received a large bonus the end of 1991 ($22,755), as did Michael's son who works at Alyson's ($5,800). Tr. at 44–45. Carolyn had her father deposit her bonus check into his account (Tr. at 60) admittedly to hide the income from the IRS. Tr. 62.

There were also many questions about a check drawn on the NuGelt account in January 1991 to cover a birthday party at the Hershey Hotel for Carolyn's father. Both Michael and Carolyn testified that they were positive the money was repaid later that month (they could not remember when exactly). Tr. at 29, 47–48. Carolyn's mother gave her cash. Tr. at 59.

Finally, there was one other important point made at trial: Michael Moskowitz identifies completely with his closely held company NuGelt. When asked by his counsel whether he had filed under Chapter 11, he testified that he had not; he was apparently unaware that there is a distinction between his personal bankruptcy proceeding and NuGelt's:

Q. Mr. Moskowitz, focusing on your personal case now, do you recall filing before this Court a Chapter 11 plan and disclosure statement?
A. In my personal case?
Q. In your personal case.
A. Meaning NuGelt?
Q. No. You are Michael Moskowitz.
A. No.
* * *
A. I always thought I was tied to NuGelt.
Tr. at 41.

## III. ANALYSIS

Movants assert that they have shown cause to convert or dismiss all three Chapter 11 debtors. 11 U.S.C. § 1112(b). In the alternative, they request appointment of a trustee to run the businesses. 11 U.S.C. § 1104. The Debtors counter that cause does not exist under section 1112(b), nor is appointment of a trustee appropriate.

Section 1112(b) provides in pertinent part:

[O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this Chapter to a case under Chapter 7 of this title or may dismiss a case under this Chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors; ...

(10) nonpayment of any fees or charges required under Chapter 123 of title 28.

### A. *Cause*

■ Courts have wide latitude in determining whether cause exists to convert or dismiss. The section provides ten enumerated examples which constitute statutory cause. *In the Matter of Berryhill*, 127 B.R. 427, 430 (Bankr.N.D.Ind.1991). However the court is not limited to the statutory examples and cause may be determined from the facts and circumstances of the case. *First National Bank of Sioux City v. Kerr (In re Kerr)*, 908 F.2d 400, 404 (8th Cir.1990). Perhaps the most apt description of cause which applies to all three debtors comes from Judge Grant: "It is clear that the debtors are not diligently prosecuting this matter to a conclusion. Instead, they are apparently content to remain under the protection of Chapter 11 and do little more than react to complaints of inaction." *Berryhill*, 127 B.R. at 432 (finding cause to dismiss based on repeated delays and defaults).

### 1. NuGelt

■ Movants assert numerous statutory grounds for cause based on the facts: the continuing diminution of estate assets, inability to propose a confirmable plan and the nearly four-year prejudicial delay with no showing of progress towards confirmation. Movants devote much of their argument to

the large monthly "operating expenditures" leaving the estate each month to meet personal expenses of NuGelt's principals. The United States Trustee argues that these payments violate the absolute priority rule by paying equity holders ahead of creditors. First Federal argues that the Moskowitzes may be entitled to a salary but it must be reasonable and they have the obligation to justify the value of their services. Both argue that these so-called operating expenditures are a misuse of estate funds which is both a breach of the debtor-in-possession's fiduciary duties to the estate and its creditors, and beyond the power of this court to approve.

The court finds section 1112(b) cause based on misuse of estate funds and other breaches of the debtor-in-possession's fiduciary duty to the estate and its creditors. There is a second separate basis for the court's finding and that is the intentional violation of an order of this court. Undoubtedly there are multiple grounds for a finding of cause with this Debtor. The court does not reach many of the probably legitimate grounds raised by First Federal and the United States Trustee.

■ The debtor-in-possession is a fiduciary to the estate and its creditors. "[I]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession. Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) (*citing Wolf v. Weinstein*, 372 U.S. 633, 649–52 & 651, 83 S.Ct. 969, 979–808, 980, 10 L.Ed.2d 33 (1963)). Failure to comply with these obligations may be cause for dismissal. *In re Wells*, 71 B.R. 554, 557 (Bankr.N.D.Ohio 1987).

The hallmark of a trustee is accountability and segregation of funds. These rules are reflected in the requirements (for example) that the debtor-in-possession open a separate DIP account, file monthly DIP statements with the United States Trustee and obtain court approval for transactions out of the ordinary course.

Throughout the NuGelt bankruptcy the corporate shareholder and officers have used the assets of the estate as their personal assets. The individuals' obligations have been satisfied from the corporate coffers. For example, Mr. Moskowitz's Family Court ordered payments of alimony, child support and legal fees to his former wife are listed as "Wage Attachments" in NuGelt's "Other operating expenses paid" schedule of the Monthly Report. These are the checks written on the DIP account to cover alimony, child support and legal fees Mr. Moskowitz has been ordered by the Family Court to make to his former wife Mrs. Beverly Moskowitz. The total postpetition payments by the Debtor-in-Possession to Mr. Moskowitz's former wife are approximately $62,686.80 through February 1992.

There is no possible way to justify these payments as an operating expense of the corporate debtor NuGelt. It is irrelevant that Mr. Moskowitz will be in contempt if these payments are not made or face jail: "This court cannot act as a reviewer of state court decisions nor permit relitigation of issues tried in the state courts." *In the Matter of Young*, 76 B.R. 376, 379 (Bankr. D.Del.1987).

■ The premise that insiders may simply take what they need or want of the estate's assets is contrary to the Bankruptcy Code and the fiduciary duty owed the estate and its creditors. There is universal agreement among the courts that using estate property to pay personal expenses of the debtor's principals is a misuse of estate property. *See, e.g. Wells*, 71 B.R. at 558; *In re Lloyd, Carr and Co.*, 617 F.2d 882, 885 (1st Cir.1980) (court has no power to authorize personal use of estate funds by the debtor) (Act case).

The shareholder distributions of more than $327,000 raise the same issue of misuse of estate property, plus several others. Both Carolyn and Michael testified that these distributions are made in lieu of salary. The Monthly Reports list "NONE"

under salaries of officers and owners. Mr. Moskowitz claims this treatment of owner and officer salary is mandated by the favorable tax treatment afforded shareholder distributions by sub-Chapter S corporations compared to salaries.

To the extent these distributions may be considered insiders' salaries, they are reviewable by the court. In *In re Zerodec Mega Corp.*, Judge Twardowski held that not only may the court review the retention of a Chapter 11 debtor's officers, but that their salary may be reduced by the court if insiders cannot show that the salary is justified. 39 B.R. 932, 935 (Bankr.E.D.Pa. 1984). The Moskowitzes have been drawing the equivalent of salary plus all living expenses through the NuGelt DIP account, whether in the form of wage attachments, shareholder distributions, or car payments and insurance. "[I]nsider transactions are subject to greater scrutiny than 'arms length' transactions," *Id.;* the Moskowitzes have foreclosed review of NuGelt's insiders' salaries.

The United States Trustee argues that these shareholder distributions violate the absolute priority rule by putting those least entitled to payment under the Code ahead of creditors. 11 U.S.C. § 1129(b)(2). The court would have to agree, particularly as the debtors appear to be practicing a form of creeping reorganization through unchecked disbursements of NuGelt income. *See In re Cloisters of Brevard, Inc.*, 117 B.R. 722 (Bankr.M.D.Fla.1990).

The United States Trustee and First Federal argue that the large monthly shareholder distributions and personal expenses charged to NuGelt are a "continuing loss to or diminution of the estate." Movants are absolutely right; there is no other way to characterize these payments.

Testimony at trial placed NuGelt's cash on hand at $37,000, although it has been argued that the figure is actually closer to $100,000 when trade debt is added to it. Post-petition NuGelt has reported total gross sales of nearly $11,000,000 and an annual profit of $1,000,000, but its cash reserves have not reflected the excellent business revenues.

Given the debtor-in-possession's propensity to siphon off NuGelt's profits, the court finds there is little likelihood of rehabilitation. NuGelt has reached an impasse with its major secured creditor and really has not taken any steps towards a plan in years. Coupled with the constant bleeding of assets of the estate, the court finds that there is cause under section 1112(b)(1).

■ Finally, NuGelt is in violation of this court's Order to pay First Federal $10,000/ month. These were the only payments First Federal received, and a lesser sum than what it was entitled to prepetition, or what it can expect under a plan of reorganization. The court holds that intentional violations of an order of this court constitutes cause under section 1112(b). Under section 109(g)(1) dismissal for "willful failure of the debtor to abide by orders of the court" results in a six month statutory bar to refiling.

### 2. Mybev

■ The court finds statutory cause to convert or dismiss the Chapter 11 petition of debtor Mybev under section 1112(b)(10).

The United States Trustee reported that Mybev has failed to pay quarterly fees as required by section 1930(a)(6) of Title 28 for the fourth quarter of 1988 and all quarterly fees from the second quarter of 1989 through the present. This was not disputed by the Debtor. The United States Trustee also faulted Mybev for failing to file monthly reports. Mybev represented to the court that its filing was a mere formality, a consequence of NuGelt's bankruptcy, and because it receives no income and makes no disbursements, there is no need to comply with the United States Trustee's monthly reporting requirements.

Mybev's admitted failure to file monthly operating reports may be cause to convert or dismiss under section 1112(b). *In re Cloisters of Brevard, Inc.*, 117 B.R. 722 (Bankr.M.D.Fla.1990). While the court is sympathetic to Mybev's claim that the reports are needless in this instance, the United States Trustee has no way to know if the reports are not being filed because they are unnecessary or if the reports are

not being filed as part of a nefarious plan to conceal income. Indeed, there may even be a difference of opinion as to why the debtor is not in compliance with the United States Trustee's monthly reporting requirements.

First, the United States Trustee has the statutory duty to monitor these cases. The job would be impossible without some sort of reporting requirement. Second, if the court were to condone the selective abuse of formalities, debtors could ignore requirements as they deemed it appropriate and there would be no impetus for reorganization. If a debtor chooses to seek the protection of the bankruptcy court, it must play by the rules.

The failure to file monthly reports, standing alone, does not constitute cause under section 1112(b), given its long-standing nature and lack of notice to Mybev that it would not be tolerated. However, taken with the inability to effectuate a plan and failure to pay fees under Chapter 123 of title 28, the court finds statutory cause to convert or dismiss under section 1112(b)(2) and (10).

### 3. Moskowitz

■ The United States Trustee argues that there is cause to dismiss Moskowitz's petition based on prejudicial delay. The court agrees. 11 U.S.C. § 1112(b)(3).

■ Generally courts find cause under section 1112(b) for dilatory behavior by individuals in Chapter 11. *See, e.g., In re Canion*, 129 B.R. 465 (Bankr.S.D.Tex.1989) (dismissal granted after ten months in Chapter 11); *Matter of Berryhill*, 127 B.R. 427 (Bankr.N.D.Ind.1991) (two and one-half years). Often the cases are marked by some sort of abuse, whether it's noncompliance with reporting requirements (*Berryhill*) or the appearance of settling in for a spending spree under the protection of the court. (The *Canion* debtor had spent $4,500 on yard and pool maintenance, $14,000 on car payments, $18,000 on credit cards and $3,000 for country club expenses in less than one year.)

Moskowitz is not a large corporate debtor requiring a complicated plan or disclosure statement. There is absolutely no reason it should take four years to propose a confirmable plan, if one is possible. Mr. Moskowitz is personally liable on the notes held by First Federal. He has substantial assets (house, Porsche, real estate) that could be used to satisfy a state court judgment. During his bankruptcy, his major creditor has received nothing. The delay of nearly four years for no legitimate reason is prejudicial to creditors. The court finds that the fact that the Debtor has failed to emerge from Chapter 11 in more than 44 months is cause under section 1112(b)(3).

Moskowitz has stopped filing monthly operating reports. "Timely and accurate financial disclosure is the life blood of the Chapter 11 process. Monthly operating reports are much more than busy work imposed on a Chapter 11 debtor.... They are the means by which creditors can monitor a debtor's post-petition operations. As such, their filing is very high on the list of fiduciary obligations imposed upon a debtor in possession. Thus, the failure to file operating reports 'in itself constitutes 'cause' for dismissal.'" *Berryhill*, 127 B.R. at 433 (citations omitted) (*quoting In re McClure*, 69 B.R. 282, 289 (Bankr. N.D.Ind.1987)). Carolyn Moskowitz testified that she stopped filing monthly reports for Michael, as they were identical to NuGelt's. Tr. at 69.

The court sees this failure as related to Moskowitz's view of his bankruptcy case as identical to that of his closely held company, NuGelt, and his free use of assets of the NuGelt estate. Possibly if the three debtors before the court today, NuGelt, Moskowitz, and Mybev, had maintained separate identities in bankruptcy, one or more of them would have had a better chance of emerging as a reorganized debtor or discharged individual.

### B. *Remedy*

Originally the United States Trustee and First Federal sought appointment of a trustee as a least favored alternative. After the hearing, the United States Trustee advocated dismissal only, and apparently First Federal continues to argue this last option in the event the court does not find

cause to convert or dismiss. Each Debtor has argued against the appointment of a trustee. Because the court finds cause and further finds that dismissal is appropriate in each case, the court will not reach the issue of appointment of a trustee.

■ After the court has made the threshold determination that cause exists, the court must decide whether conversion or dismissal "is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b); *In re Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D.Pa.1991). One application of the best interest test to creditors is to compare their rights in bankruptcy with their rights under state law. *See Id.* at 388 (*citing In re GPA Technical Consultants, Inc.,* 106 B.R. 139, 144 (Bankr.S.D.Ohio 1989)). The decision is discretionary, based on the facts of each case. *In re Winslow,* 123 B.R. 641, 631 (D.Colo.1991); *In re Sullivan,* 108 B.R. 555, 557 (W.D.Pa.1989).

### 1. NuGelt

■ Certainly it is painfully obvious to all involved that this case cries out for conversion or dismissal. In similar cases courts have ordered conversion to ensure that creditors receive some payment. "The debtor has demonstrated throughout this case that it cannot be trusted to act as debtor-in-possession. It is in the best interest of creditors and the estate, therefore, to convert the case to Chapter 7 where a trustee can liquidate the estate and insure that creditors will be paid." *Cloisters,* 117 B.R. at 723.

Under the special facts of this case, the court finds it more appropriate to order dismissal rather than conversion. As the United States Trustee asserts, the case is essentially a two-party dispute between the Debtor and First Federal. The Official Committee of Unsecured Creditors, appointed by the United States Trustee in 1988, has not been active in the case for years. No one involved in these cases expects the unsecured creditors to receive a cent. Accordingly, under the best interests of creditors test the court need only consider the only creditor who stands to receive anything: First Federal. Problems the bankruptcy court is normally concerned with, such as the race to the court house,

are absent in the situation where the entire estate will go to the major secured creditor. (And this appears to be the case regardless of the court's decision on valuation.)

At the same time, NuGelt is a thriving restaurant. Mr. Moskowitz spoke with pride from the witness stand of the post-petition profit of one million dollars a year. It would be unfortunate to force the liquidation of such a profitable business. It is in the best interest of the estate to continue as a profitable business, and it is in the best interest of First Federal to resolve its state law issues speedily in state court. There may be further delay and administrative costs if the court were to convert Nu-Gelt rather than dismiss.

This court is also giving the debtor the benefit of the doubt: with its hard working management team and strong revenues it should be able to survive outside bankruptcy subject to normal state laws. Perhaps out of bankruptcy the debtor will be motivated to adopt some of the cost cutting measures recommended for restaurants by Mr. Laskaris (First Federal's expert on restaurant management and accounting procedures). If NuGelt cannot operate profitably outside of Chapter 11 making normal debt payments, it may file again in six months under Chapter 7.

### 2. Mybev

■ In the single asset Chapter 11 case, conversion to Chapter 7 is tantamount to dismissal (or granting relief from stay). *See In re Guaranteed Retirement, Inc.,* 112 B.R. 263, 279 n. 11 (Bankr.N.D.Ill. 1990). The court finds that each option would lead to much the same result, with dismissal perhaps the fastest and least costly alternative for all concerned. Especially here where it serves little purpose to dismiss the main debtor NuGelt and leave the satellite debtor in Chapter 11.

### 3. Moskowitz

■ The United States Trustee argues that dismissal is preferable over conversion in that there would be no unencumbered assets available for distribution to unsecured creditors. The court agrees that the increased administrative costs of a trustee

to liquidate Mr. Moskowitz's assets are unnecessary. If it does come to a liquidation, the only creditor to receive anything will most likely be First Federal. A liquidation in favor of a single secured creditor may be accomplished just as easily in a state court foreclosure proceeding as in a Chapter 7 liquidation.

## IV. RELATED ADVERSARY PROCEEDINGS

The court may at its discretion retain jurisdiction over adversary proceedings after dismissing the main case. 11 U.S.C. § 349; *In re Roma Group, Inc.*, 137 B.R. 148, 22 B.C.D. 1133 (Bankr.S.D.N.Y. 1992). The circumstances are not present which would warrant retention of jurisdiction. Most of the motions currently pending in this court are resolved by the dismissal; those that are not may be expeditiously resolved in a single state court action.

## V. CONCLUSION

For the reasons given, the court finds that dismissal of all three Chapter 11 debtors is appropriate on these facts.