# United States Court of Appeals
## For the First Circuit

---

No. 99-1865

IN RE MAILMAN STEAM CARPET CLEANING CORP.,

Debtor.

_____

GARY R. LEBLANC,

Appellant,

v.

RICHARD P. SALEM, TRUSTEE, ETC.,

Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

---

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

---

Gary R. LeBlanc, pro se ipso, for appellant.
Richard P. Salem, pro se ipso, for appellee.

**SELYA, Circuit Judge.** This appeal requires us to revisit the final resting place of Mailman Steam Carpet Cleaning Corp. (the debtor). An earlier opinion of this court adumbrates the relevant background, see LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 2-4 (1st Cir. 1999) (Mailman I), and an abbreviated version, borrowing heavily from the original, suffices here.[1]

In October 1990, the debtor, represented by Attorney Gary R. LeBlanc, won a verdict in excess of $450,000 against Alfred C. Lizotte in an environmental suit. An appeal ensued. Betimes, the debtor attached a parcel of commercial real estate (upon which Al's Service Station, a corporation controlled by Lizotte, operated a Gulf station) in an effort to secure the judgment.

Before collecting any sums from Lizotte, the debtor slid into bankruptcy. See 11 U.S.C. §§ 701-766 (1994 & Supp. 1999). The Lizotte judgment thus became a principal asset of the bankruptcy estate and LeBlanc, who had been engaged under a

---

[1]We previously warned that the record in this case "lacks crucial documents" and requires us to use approximate numbers throughout. Mailman I, 196 F.3d at 2. That warning still applies.

contingent fee arrangement, became a creditor.  On September 18, 1995, the trustee in bankruptcy, Richard P. Salem, notified the court and creditors of his intention to compromise the judgment for $100,000.  LeBlanc, qua creditor, objected.

The bankruptcy court held a hearing during which Salem introduced an appraisal that estimated the fair market value of the property, including the fixtures and equipment associated with Al's Service Station (the Corporation), at $390,000, and then assigned $175,000 of this total to the "[l]and, buildings and installations" owned personally by Lizotte (and, thus, subject to the attachment).  The appraiser also pointed out that the real estate was encumbered by a prior first mortgage that secured nearly $100,000 in debt.  LeBlanc asserted that the real estate was worth much more than the estimate but offered no concrete evidentiary support for a different valuation.  No other creditor objected to the anticipated settlement.

In the end, the bankruptcy court approved the proposal, subject to the following condition:

> If the gas station is sold within two years from [October 19, 1995], the trustee may move for revocation of this approval. Depending on the facts of the sale, the court will then either confirm or revoke its approval.

The court denied LeBlanc's subsequent motion to alter or amend and ordered Salem to deliver an executed discharge of the lien,

-3-

to be held in escrow pending payment of $100,000 to the bankruptcy estate.

Approximately seven months later, Lizotte and the Corporation sold the real property and the business assets of the Corporation for an aggregate price of $560,000. Lizotte maintained that the business assets represented most of the value; thus, he proposed to satisfy the first mortgage, remit $100,000 to Salem to complete the settlement, and pay the remaining net proceeds to the Corporation's creditors (the largest of which apparently was Gulf Oil or its distributor, New England Petroleum). Contending that this allocation was a sham and would fraudulently divert $360,000 from Lizotte's creditors (including the debtor), LeBlanc moved to compel Salem to seek revocation of the order conditionally approving the settlement. The bankruptcy court granted LeBlanc permission under Fed. R. Bankr. P. 2004 to examine Lizotte, Gulf, and the Corporation, limited, however, to information concerning the terms of the sale and to whom the proceeds had gone.[2]

The permitted discovery moved at a snail's pace. Finally, the depositions concluded and Salem sought leave to

---

[2]The court subsequently denied LeBlanc permission to examine the buyer, Peterborough Oil Co. LeBlanc gripes about this ruling in passing, but has neither assigned error to it nor made any suitably developed argumentation in regard to it.

abandon the reserved right to seek revocation of the settlement. LeBlanc — and LeBlanc alone — opposed abandonment. At a hearing held on April 15, 1998, LeBlanc recounted his version of the pertinent facts and the conclusions that he had drawn from his investigation. See Mailman I, 196 F.3d at 3-4 (describing LeBlanc's contentions). Apparently unimpressed, the bankruptcy court overruled his objection and authorized Salem to surrender the right to seek revocation.

LeBlanc appealed both this order and a collateral order dealing with the allowance of his claim.[3] After some skirmishing — including a remand for further findings — the district court upheld both determinations. See In re Mailman Steam Carpet Cleaning, Civ. No. 99-40083-EFH (D. Mass. June 25, 1999) (Mailman II). LeBlanc then prosecuted this appeal. In it, he presses two assignments of error.

**The Abandonment Order**

The appellant first solicits our intervention in respect to the order approving abandonment of the right to seek revocation of the settlement. As the appellant acknowledges,

---

[3]Striking on a different front, LeBlanc simultaneously filed an adversary proceeding against Salem, in which he alleged negligence and breach of fiduciary duty stemming from Salem's failure to seek revocation of the settlement. The bankruptcy court rejected this initiative, granting summary judgment in Salem's favor. The district court affirmed, and so did we. See Mailman I, 196 F.3d at 4-9.

the standard of review is abuse of discretion.  See Prebor v.

Collins (In re I Don't Trust), 143 F.3d 1, 3 (1st Cir. 1998).

The abuse of discretion rubric is not hard and fast.  See 1

Steven Alan Childress & Martha S. Davis, Federal Standards of

Review § 4.21, at 4-131 to -139 (3d ed. 1999).  Here, we apply

it against the background understanding that "[c]ompromises are

favored in bankruptcy."  Hicks, Muse & Co. v. Brandt (In re

Healthco Int'l, Inc.), 136 F.3d 45, 50 n.5 (1st Cir. 1998)

(quoting 9 Collier on Bankruptcy ¶ 9019.01, at 9019-2 (15th ed.

1995)).

A chapter 7 trustee is entrusted to marshal an estate's

assets and liabilities, and proceed in settling its accounts on

whatever grounds he, in his informed discretion, believes will

net the maximum return for the creditors (on whose behalf he

toils).  When augmentation of an asset involves protracted

investigation or potentially costly litigation, with no

guarantee as to the outcome, the trustee must tread cautiously

— and an inquiring court must accord him wide latitude should he

conclude that the game is not worth the candle.  See, e.g., id.

at 50-52.  After all, "a chapter 7 trustee is required to reach

an informed judgment, after diligent investigation, as to

whether it would be prudent to eliminate the inherent risks,

delays and expense of prolonged litigation in an uncertain

cause."  Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1145 (1st Cir. 1992).

These principles are dispositive here.  LeBlanc mounts a claim of fraud — a claim that, after earnest investigation, he cannot substantiate.  In order to probe the claim more thoroughly, the trustee would have to deplete the estate's (already slim) assets in exploring what might well prove to be a dry hole.  Given the known facts, a decision to go no further seems easily defensible.

Lizotte is now in bankruptcy, with no visible assets apart from the real estate which is at issue in this proceeding.  The sale to Peterborough Oil reportedly was contingent on the payment of roughly $200,000 to Gulf Oil/New England Petroleum, and a further payment of $60,000 for a covenant not to compete.  The mortgage — a priority lien — had a balance of nearly $100,000.  Backing these sums out of the sales price left only $200,000 on the table — some of which obviously would have to be devoted to closing costs, taxes, attorneys' fees, and the like.  Under those circumstances, accepting a $100,000 settlement rather than either frustrating the sale (by attempting to block the $200,000 payment) or prolonging the squabble about how to allocate the sales price between real property and business assets does not appear unreasonable.  Trustees must take care

not to throw good money after bad, and, on this somewhat opaque record, Salem's inclination to embrace the settlement is a choice which appears deserving of some deference.

Nor was Salem's position rubber-stamped. The bankruptcy court conducted no fewer than four hearings to scrutinize the appellant's claims. Upon considering all the available evidence, the court elected, as its discretion fully allowed, to accept the trustee's recommendation. The situation thus is reminiscent of In re Thompson, in which we wrote:

> [T]he baseline for appellants' opposition to the proposed settlement rests in their readiness to second-guess the informed judgment of the chapter 7 trustee, as well as the discretionary determination of the bankruptcy court, that continued litigation would not result in a net benefit to the chapter 7 estate. . . . The important policy favoring efficient bankruptcy administration normally will warrant judicial recognition that the chapter 7 trustee, . . . rather than . . . an individual creditor, is the more appropriate arbiter of the "best interests" of the chapter 7 estate.

965 F.2d at 1145 (citations omitted).

The district court also reviewed the facts. In an abundance of caution, it remanded for further findings and ultimately affirmed the decision of the bankruptcy court. See Mailman II, slip op. at 3. The court stated that "the record simply does not reflect that the land owned by Lizotte and

-8-

secured by the real estate attachment was valued at more than the $200,000 [originally] estimated by the independent real estate appraiser." Id. It then noted that the appellant had neither introduced any contrary expert testimony nor proffered any hard evidence "that Lizotte [had] manipulated the valuation of his real estate." Id. Consequently, the district court concluded that the bankruptcy court had not abused its discretion. See id.

We appreciate that, notwithstanding the district court's imprimatur, we must independently review the bankruptcy court's determination. See Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997). But that review should not occur in a vacuum. In this instance, the decision whether to seek revocation of the settlement has been poked, prodded, and probed at some length. For present purposes, the acid test of the bankruptcy court's decision is not whether pressing onward might have produced more funds for the estate but, rather, whether accepting the settlement (and thereby forgoing the risks inherent in intransigence) fell within the universe of reasonable alternatives. The ascertained facts, as revealed by the record, convince us that the bankruptcy court did not exceed the wide boundaries of its discretion in determining that a bird

in the hand was worth more than continued shaking of a potentially barren bush.

## The Claim Allowance

We turn next to LeBlanc's second assignment of error. The facts are these. The debtor originally retained LeBlanc to handle the environmental suit pursuant to a written retainer agreement, dated June 20, 1988, that specified a one-third contingent fee based on the "verdict, jury award or settlement." LeBlanc succeeded in obtaining a verdict against Lizotte in mid-1990. With an appeal in prospect, he prepared a neoteric fee agreement that provided, in substance, that he would handle the appeal and receive an aggregate fee equal to the greater of 43% of any recovery or his overall time charges (based on specified billing rates). The debtor signed this agreement in November 1990.

When the debtor later filed for bankruptcy and LeBlanc served a proof of claim based on the November 1990 fee agreement, the agreement proved as much necrotic as neoteric; the bankruptcy court struck it down as violative of Rule 3:05(5)(e) of the Rules of the Supreme Judicial Court of Massachusetts (which at the time provided, in pertinent part, that a contingent fee shall not "exceed stated maximum

-10-

percentages of the amount collected").[4]  The court did not disallow LeBlanc's claim entirely, however, but allowed it to the extent of one-third of the amount of the litigation proceeds ultimately collected.  The district court affirmed these twin determinations, holding (1) that the bankruptcy court did not err in finding the November 1990 fee agreement unenforceable, and (2) that the bankruptcy court's allowance of the claim in an amount equal to one-third of the actual recovery was "reasonable and do[es] not constitute an abuse of discretion."  Mailman II, slip op. at 4.

Like the district court, we review de novo the bankruptcy court's rulings of law and test its findings of fact for clear error.  See BayBank-Middlesex v. Raylar Distributors, Inc., 69 F.3d 1200, 1202 (1st Cir. 1995).  We think it is significant here that the claim under review is essentially a claim for an attorney's fee.  The bankruptcy court's role is preeminent in determining the reasonableness of fees claimed in bankruptcy proceedings, and the court's determinations in that wise are reviewed with great deference.  See In re I Don't

---

[4]In the District of Massachusetts, both the federal district court and the bankruptcy court have incorporated the Supreme Judicial Court's ethical standards into their own rules.  See D. Mass. R. 83.6(4)(B); Bankr. Mass. R. 9020-3.  At the times relevant hereto, that incorporation embraced former S.J.C. R. 3:05 (since stricken).

<u>Trust</u>, 143 F.3d at 3; <u>In re Martin</u>, 817 F.2d 175, 182 (1st Cir. 1987); <u>Rome</u> v. <u>Braunstein</u> (<u>In re Chestnut Hill Mortgage Corp.</u>), 158 B.R. 547, 549 (D. Mass. 1993), <u>aff'd</u>, 19 F.3d 54 (1st Cir. 1994). With these tenets in mind, we consider the particulars of the appellant's claim.

We most assuredly cannot fault the bankruptcy court for refusing to honor the November 1990 fee agreement. By leaving open the possibility of fees in excess of the stated percentage, that agreement plainly ran afoul of the then-applicable ethical canon, S.J.C. R. 3:05(5)(e). The court therefore had the right — and, arguably, the duty — to refuse to enforce it. <u>See</u> <u>Berman</u> v. <u>Linnane</u>, 424 Mass. 867, 871-72 & n.7 (1997).

This brings us to the reasonableness of the allowance. Since the November 1990 fee agreement had purported to supplant, not merely supplement, the original fee agreement, the bankruptcy court determined that it would consider not only the original agreement, but also equitable doctrines. In the end, it approved LeBlanc's claim to the extent of one-third of the amounts actually realized on the judgment against Lizotte. We glean from the record that the court thought this sum reasonable in relation to the services rendered and to the result achieved and believed that such an award would prevent unjust enrichment of the bankruptcy estate. Indeed, the court expressly found

that "one-third of the recovery, plus expenses" constituted a "typical compensation arrangement for matters such as this" and was "[f]air" in the circumstances of this case.

In our view, the allowance of the claim passes the test of reasonableness with flying colors. Because we do not wish to belabor the obvious, we add only a brief comment.

Having found that the November 1990 fee agreement violated ethical precepts, the bankruptcy court likely could have denied LeBlanc compensation altogether. See, e.g., Rome, 19 F.3d at 58; cf. Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94, 97 (1st Cir. 1988) (stating, in a non-bankruptcy context, that "[d]enial of attorneys' fees may be a proper sanction for violation of an ethical canon"). The fact that the court elected to take less draconian measures does not mean that it could attach no significance to the violation — and this is so even though it seems to have regarded the ethical shortfall as resulting from a good-faith blunder. In all events, assessing the reasonableness of claims for counsel fees is a matter "in which the court of first instance enjoys particularly great leeway," In re I Don't Trust, 143 F.3d at 3, and there is no sign that the bankruptcy court's allowance of LeBlanc's claim in a sum less than he had hoped outstripped that leeway.

The proof of the pudding is in the tasting. The essence of LeBlanc's engagement by the debtor centered around the notion that his compensation would be commensurate to the monies realized by the client. The bankruptcy court's resolution of LeBlanc's claim was faithful to this central concept; it found that LeBlanc's work had produced a recovery and that he was entitled to compensation proportionate to the size of that recovery. So viewed, LeBlanc's complaint reduces to a quarrel over the percentage that the court deemed appropriate. That ends the matter. Whether or not a higher percentage might have been sustainable, it cannot seriously be argued that the court's decision to approve the claim based on a conventional percentage (33a%) constituted an abuse of discretion.

We need go no further. At long last, the lower courts appear to have laid this tangled and contentious matter to rest. We discern no error in their administration of these last rites.

**Affirmed.**