**In re Michael VAZQUEZ, Debtor.**

**In re Jose E. Carro, Debtor.**

**Nos. 00–16001–BKC–RAM,
00–16003–BKC–RAM.**

United States Bankruptcy Court,
S.D. Florida,
Miami Division.

March 3, 2005.

Paul L. Orshan, Duane Morris LLP, Miami, FL, for Debtors.

James B. Miller, James B. Miller, P.A., Miami, FL, for trustee.

Brian S. Behar, Behar, Gutt & Glazer, P.A., Aventura, FL, for Federal Financial Company.

## MEMORANDUM DECISION AND ORDER APPROVING STIPULATION BETWEEN DEBTORS AND TRUSTEE

THOMAS S. UTSCHIG, Bankruptcy Judge.

On January 6, 2004, this Court entered an order granting the bankruptcy trustee's motion for approval of a settlement with the debtors.[1] Federal Financial Company appealed that decision and on appeal the district court reversed and remanded the case for further consideration, finding that this Court did not conduct a sufficiently independent examination of the trustee's proposed settlement. On January 12, 2005, the Court conducted a second hearing regarding the proposed settlement in accordance with the district court's remand so as to determine whether the settlement is fair, reasonable, and should be approved.

The facts are relatively straightforward. On July 10, 2000, Federal Financial filed involuntary bankruptcy petitions against debtors Michael Vazquez and Jose E. Carro. Approximately two years later, on July 29, 2002, the bankruptcy court entered orders for relief under Chapter 7 against the debtors, and Alan Goldberg, a panel trustee, was appointed interim trustee in both cases. According to Ms. Yip's testimony, prior to the Section 341 meeting Federal Financial's attorney asked if she would be willing to serve as trustee instead of Mr. Goldberg. Ms. Yip is not a panel trustee, but she is a certified fraud examiner and forensic accountant. Brian Donegan, the representative of Federal Financial, testified that his company wanted Ms. Yip to serve as the trustee because her specific expertise would be helpful in unraveling the financial situations of these debtors. On September 25, 2002, Ms. Yip attended the debtors' Section 341 meetings and accepted the appointment as trustee.[2]

Litigation ensued. One of the debtors, Michael Vazquez, commenced an adversary proceeding seeking a declaratory judgment against the trustee. The trustee responded with a counterclaim and third-party complaint. The essence of the adversary complaint related to events which took place in state court. Federal Financial had obtained money judgments on its claims against the debtors.[3] According to Ms. Yip, it appears that Federal Financial thereafter discovered a piece of property owned by Michael Vazquez, ostensibly titled in his name "as trustee." Federal Financial caused a notice of levy and notice of sheriff's sale to be issued regarding

---

1. The trustee's "proposed global settlement" contemplates a payment of $400,000.00 to the estate by the debtors. In exchange for that payment, the trustee agrees to not pursue any dischargeability actions against the debtors under 11 U.S.C. § 727, to dismiss her appeal of certain litigation, and to release the debtors and various other parties of any liability, including liability for any preferential or fraudulent transfers, and to allow the debtors' exemption claims. See Paragraphs 66–67 of the Trustee's supplemental direct statement.

2. According to her testimony, at the 341 meeting Ms. Yip witnessed Mr. Goldberg complain that Federal Financial, through its attorney, had demanded that Mr. Goldberg engage Mr. Behar's law firm as counsel to the trustee. See Paragraph 6 of Ms. Yip's supplemental direct statement. It is unclear what effect, if any, Mr. Goldberg's reaction to this demand had upon Federal Financial's decision to elect a different trustee.

3. As will be discussed more later, Federal Financial purchased this claim from the Resolution Trust Corporation as part of a "package" of loans.

this property. Apparently, the real property (the so-called "Turnpike Trust property") may have been partially acquired with funds that Vazquez and his wife had received from the sale of their homestead property. The debtor claimed that his interest in this subsequent real estate was taken "as trustee." While Federal Financial attempted to convince the state court that no real trust had been created and that Vazquez held title to the property individually, the state court disagreed and ruled that the property was not subject to any lien in favor of Federal Financial.

After the state court's decision, the property itself was sold. Federal Financial apparently consented to the sale as it permitted the state court clerk to issue a cash bond so that the sale could take place. As such, the debtors filed a cash bond in state court in the amount of $1,348,885.09, and a certificate issued by the clerk of court indicated that the creditor's judgment "lien" was being transferred to the bond. The bond also indicated that it would be released "forthwith upon it being established by Court Order" that the real estate had been held by Vazquez "as trustee" and not individually.

It appears that Federal Financial filed the instant involuntary bankruptcy proceedings before the state court issued its decision. Whatever the reason for the initial filing, the bankruptcy case became the creditor's "fall back" forum after the state court ruled in the debtors' favor. The state court's decision was entered in January of 2001, and the order for relief in these cases was finally entered in July of 2002. Throughout the course of the litigation in this case, the creditor has insisted that the Turnpike Trust property is both property of the bankruptcy estate and subject to its lien, a dispute which came to a head in the adversary proceeding filed by Vazquez.[4]

On April 21, 2003, Judge Mark conducted a hearing on cross-motions for summary judgment in the adversary proceeding. At the conclusion of this hearing, Judge Mark ruled that the debtor held the property "as trustee" and that therefore it was not property of the estate (nor was it subject to Federal Financial's lien). Essentially, the bankruptcy court came to the same conclusion that the state court had reached over two years previously. The trustee states in her supplemental direct statement that she recognized at this point that the bond litigation was an "uphill battle."

Nonetheless, the trustee appealed. While that appeal was pending, the trustee and the debtors reached a settlement.[5] The trustee's motion to approve the settlement was filed on September 20, 2003, and contains four primary conditions in exchange for a payment of $200,000.00 from each debtor to the estate. First of all, the

---

4. It should be noted that the trustee's special counsel for the "bond litigation" was Brian Behar, the attorney for Federal Financial. According to the trustee, Mr. Behar informed her about the bond litigation then pending in state court prior to her appointment as trustee and was confident that he would win. Suffice it to say, the trustee's perspective on the merits of this litigation has changed during the pendency of the case.

5. This settlement was apparently negotiated by Jim Miller, the trustee's general counsel, and the trustee concedes that Federal Financial was not an overt party to this round of negotiations even though it had been kept apprised of earlier settlement discussions. According to the testimony of Brian Donegan, Federal Financial found out about the terms of the settlement after it had been reached. In the trustee's supplemental direct statement, she indicates that Federal Financial was aware of the general settlement discussions, and that she sent Mr. Behar a proposal of August of 2003 with "very similar terms" to the one ultimately accepted.

trustee would be obligated to abandon any objection to the debtors' claimed exemptions. Second, the trustee would waive all claims, with a specific reference to the waiver of all preference or fraudulent transfer claims. Third, the trustee would authorize the release of the cash bond (in the approximate amount of $1.3 million).[6] The proceeds would be used to fund the settlement (a total of $400,000,00) with the balance to be paid to the debtors. And finally, the § 727 actions filed by Federal Financial to deny the debtors a discharge in bankruptcy were expressly excluded from the scope of the agreement.

Federal Financial has raised a number of objections to the proposed settlement. First of all, Federal Financial contends that the trustee did an inadequate job of examining the debtors' claimed exemptions, especially as concerns allegations about the source of funds used by the debtors to acquire their purported exempt assets. Federal Financial also contends that as it has offered to advance the funds necessary to continue the litigation, the Court should give significant weight to its wishes regarding the proposed settlement since it appears to be the only creditor of either debtor.[7] Boiled to its essence, Federal Financial's argument is that it is the "800 pound gorilla" in this case, and that this litigation should not end unless and until Federal Financial thinks that it should.

■■■■ It is a fundamental tenet of bankruptcy jurisprudence that the proponent of a settlement, such as the trustee in this case, bears the burden of demonstrating that the proposal is both reasonable and in the best interests of the bankruptcy estate. *Butler v. Almengual (In re Almengual)*, 301 B.R. 902, 907 (Bankr. M.D.Fla.2003). When evaluating a proposed settlement, the court is obligated to evaluate the surrounding facts and circumstances in light of four principal factors:

1. The probability of success in the litigation.

2. The difficulties, if any, to be encountered in the matter of collection.

3. The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it.

4. The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*See Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir.1990); *Almengual*, 301 B.R. at 907.

■■■■ It should be noted that the court is not obligated to actually decide the merits of the various claims; it simply has to assess the "probability of succeeding on those claims." *Justice Oaks II, Ltd.*, 898 F.2d at 1549. Clearly, however, among the factors bearing on the wisdom of a proposed compromise of a debtor's claims, the bankruptcy court must consider the "paramount interest of creditors with proper deference to their reasonable views." *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914 (5th Cir.1995). A bankruptcy court should only approve a settlement when it is fair and equitable

---

**6.** It should be remembered that two courts have previously ruled that these funds were not property of the bankruptcy estate, which is largely the reason the trustee was willing to accept such an amount as a full settlement of any possible claims against the debtors.

**7.** It appears that the trustee did file a claim on behalf of another creditor, Luxcom I, but even if that claim is valid Federal Financial holds the overwhelming bulk of any claims against these estates.

and in the best interests of the estate. *Id.* at 917.

■ While the desires of the creditors are not binding, a court should carefully consider the wishes of the majority of the creditors. Indeed, under the right circumstances, creditor support for a proposed settlement is an integral component of the court's inquiry, and in various cases courts have rejected settlements which lacked the approval of the majority of creditors. For example, in *Reiss v. Hagmann,* 881 F.2d 890 (10th Cir.1989), the court rejected a settlement when there was only one creditor, that creditor was willing to cover the costs of litigation, and would receive nothing without success in the lawsuit.

■ On appeal, the district court cited *Reiss* with approval and noted that in that case the court observed that "we have found no precedent for a compromise . . . actively opposed by the major creditors and affirmatively approved by none." *Id.,* 881 F.2d at 892–93; *see also In re Lloyd, Carr & Co.,* 617 F.2d 882, 889 (1st Cir. 1980). As the court said in *Foster Mortgage,* "This suggests that a bankruptcy court may not ignore creditors' overwhelming opposition to a settlement." 68 F.3d at 918.

■ The chapter 7 trustee is required to reach an informed judgment, after diligent investigation, as to whether it would be prudent to eliminate the inherent risks, delays, and expense of prolonged litigation in an uncertain cause. *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 212 F.3d 632 (1st Cir.2000). In fact, it should be remembered that:

> A chapter 7 trustee is entrusted to marshal an estate's assets and liabilities, and proceed in settling its accounts on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors (on whose behalf he toils). When augmentation of an asset involves protracted investigation or potentially costly litigation, with no guarantee as to the outcome, the trustee must tread cautiously—and an inquiring court must accord him wide latitude should he conclude that the game is not worth the candle.

*Id.* at 635. The court is neither to "rubber stamp" the trustee's proposals nor to substitute its judgment for the trustee's, but rather to "canvass the issues" and determine whether the settlement falls "below the lowest point in the range of reasonableness." *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983).

■ The court must be informed of all the relevant facts and information in order to make an independent judgment as to whether the settlement is fair and reasonable under the circumstances. *In re Arrow Air, Inc.,* 85 B.R. 886 (Bankr. S.D.Fla.1988). As the Supreme Court stated in *Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968):

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

Federal Financial has made much of the argument (both before this Court and on appeal) that the creditor's wishes must be considered, especially in a situation where

there is only one creditor, that creditor opposes the settlement, and the creditor is willing to continue funding the trustee's litigation with the debtors. The Court agrees with Federal Financial that the interests of the creditors—and their perspectives on a proposed settlement—are of critical importance (even if there are instances in which an independent observer might conclude that the creditor's perspective is at odds with its own best interests). The question is ultimately whether this case reflects a scenario in which "proper deference" to the creditor's views dictates rejection of the trustee's settlement proposal.

■ In that regard, it should be noted that no case holds that creditors have an absolute "veto power" over approval of a settlement. Instead, they speak to "proper deference" to their *"reasonable* views." *Foster Mortgage,* 68 F.3d at 917. Such a "veto power" would run counter to the very idea that the court's task is to independently assess the proposed compromise. "Proper deference to [the creditor's] reasonable views" is not the same as saying that the court must defer to the creditor simply because the only creditor (or a majority of creditors) does not think the settlement is fair.[8] It is not the creditors' task to determine the fairness of a proposed settlement; it is the court's obligation to make that determination while making certain not to ignore their legitimate views or concerns. *Id.* at 918. While in its decision remanding this case the district court noted the challenge of approving a compromise with a debtor over the objection of the only creditor (who is willing to fund the litigation), the

circumstances of this particular case are quite unusual.

These debtors, it must be remembered, did not choose to avail themselves of this forum. Federal Financial filed an involuntary bankruptcy proceeding against the debtors and only pursued litigation in this forum after it failed to convince the state court that it was entitled to a lien against property owned by Michael Vazquez "as trustee." That same argument failed to convince Judge Mark, and he granted summary judgment in the debtor's favor in the adversary proceeding. It was that loss which spurred the trustee to consider settlement in order to obtain *some* funds for the estate rather than none.

In the typical case, it makes considerable sense to say that a creditor's wishes should be given significant deference since the debtor chose the forum and dragged the creditor into the jurisdiction of the bankruptcy court. Under such circumstances, if the creditor wishes to fund further litigation it is often reasonable to conclude that it should be entitled to do so. Here, however, the creditor apparently believed that the bankruptcy forum would be an improvement over the state court arena, and even selected the present chapter 7 trustee. Federal Financial seemingly believed that invoking the power of the bankruptcy trustee would afford it a better avenue to collect its claims against the debtors. Now it is unhappy with the outcome of that decision.

■ The invocation of this Court's jurisdiction comes at a cost. While the trustee's obligation is to marshal assets for the benefits of creditors, that task is assumed as a fiduciary relationship to the estate itself and not as some sort of "hired

---

8. Indeed, adoption of a formula which permits a creditor to have "veto power" would permit creditors who wish merely to exact their "pound of flesh" from debtors to over- rule the wisdom of an impartial third party engaged to canvas the facts and collect what funds as are available for creditors—namely, the trustee—on little more than a whim.

gun." The trustee is not the employee or agent of the creditors; they do not have the right to direct how the trustee chooses to perform the statutory duties of the position. The trustee is in essence an independent third party charged with the responsibility of maximizing assets for the estate. A bankruptcy trustee is an officer of the court that appoints him or her. *Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir.1996); *In re Vebeliunas*, 231 B.R. 181 (Bankr.S.D.N.Y. 1999). When persons perform duties in the administration of the bankruptcy estate, they act as "officers of the court" and not private persons. *In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir.1989). They are held to high fiduciary standards of conduct, and these duties are owed not only to the entire creditor body but to the debtor as well. As the court stated in *Germain v. Connecticut Nat'l Bank*, 988 F.2d 1323, 1330 n. 8 (2d Cir. 1993):

> The Chapter 7 trustee is an officer of the court and owes a fiduciary duty both to the debtor and to the creditors as a group. *See, e.g., In re Thompson*, 965 F.2d 1136, 1146 (1st Cir.1992). The creditor acts in his own interest and in general owes no duty to any other party.

■ Clearly, the trustee is not the "agent" of the creditors. The trustee's obligation—as an officer of the court—is to maximize assets as best as possible under the circumstances, not to serve as an extension of a creditor whose other collection efforts have been forestalled. In many cases, the trustee's fiduciary duties may well require litigating a matter to conclusion; in other instances, a trustee may find that a settlement is the most effective way to expedite litigation and avoid uncertainty. And in those instances in which the trustee's comprehensive examination of the underlying facts leads to a conclusion that further litigation will lead only to diminishing returns, protracted investigation, or costly litigation with absolutely "no guarantee as to the outcome," an inquiring court is to afford the trustee "wide latitude." *Mailman Steam*, 212 F.3d at 635.

■ The Court agrees that a creditor's willingness to fund litigation is an appropriate consideration when weighing the reasonableness of a proposed settlement. However, the fact that the creditor is willing to fund additional litigation should not itself be controlling. Again, it seems contrary to the intent of the code that the trustee's role could be subverted from an independent, fiduciary capacity to one in which the trustee is compelled to pursue a course of litigation which she does not believe will prove fruitful. Once upon a time, bankruptcy relief was envisioned as simply an extension of a creditor's other collection efforts, but that is not the intent of the present bankruptcy code. The purpose of the bankruptcy code is to afford a forum for the fair and orderly liquidation of a debtor's assets, not for creditors to pursue litigation which is speculative at best. In *Reiss*, the court suggested that the chance of successful recovery in the underlying litigation was properly evaluated at "nearly one hundred percent." *See* 881 F.2d at 892. The trustee in the present case has no such certainty of success.

■ With this in mind, the Court now turns to the facts of the case. The key inquiry is whether the trustee's proposed settlement is fair and reasonable, and whether it falls below the "lowest point in the range of reasonableness." It is in that context that the Court must give "proper deference" to the creditor's "reasonable views." And in determining whether the settlement is fair and reasonable, the Court is obligated to independently assess the likely prospects for realizing additional revenues, as well as the likely results of

additional litigation. The basic directive in this process is to compare the terms of the compromise with the likely rewards of litigation. *Anderson,* 390 U.S. at 424–25, 88 S.Ct. 1157.

In its appeal from this Court's January 6, 2004, order which approved the stipulation, Federal Financial argued that it had been improperly prevented from demonstrating that the trustee had not conducted a sufficient investigation into the debtors' exemption claims. Essentially, Federal Financial contended that the trustee did not have enough information to form a legitimate (or reasoned) opinion as to the merit of the debtors' exemption claims. Federal Financial makes much of the fact that the trustee did not take the deposition of the debtors or their family members and did not know exactly how certain assets had been valued.

However, as Federal Financial's own witness indicated, this was a case for a forensic accountant. It is a document-intensive case.[9] The trustee and her agents examined the documents.[10] They consulted with the debtors' counsel and learned of possible defenses.[11] The trustee's attorney conducted extensive legal research and was concerned that a Florida Supreme Court case, *Beal Bank, SSB v.*

*Almand & Assocs.,* 780 So.2d 45 (Fla. 2001), might control the determination of whether or not certain assets were owned by the debtors and their respective spouses as "tenants by the entirety." In that case, the court stated:

> Although we understand the considerations that originally led to this Court's decision not to adopt a presumption of a tenancy by the entireties in personal property similar to that in real property, we conclude that stronger policy considerations favor allowing the presumption in favor of a tenancy by the entireties when a married couple jointly owns personal property.

*Id.,* 780 So.2d at 57. The trustee's forensic review of the debtors' financial affairs indicated that it certainly appeared that many, if not all, of the allegedly exempt assets were held as tenants by the entirety, and it was her conclusion that it would be difficult to overcome the presumption in favor of such ownership of assets by husbands and wives under Florida law. The trustee therefore had legitimate concerns regarding the potential success of any objection to the debtors' exemption claims.

It is certainly true that the *Beal Bank* case places significant hurdles on creditors

---

9. The trustee's counsel supplied the Court with some eight binders of exhibits for the hearing.

10. The trustee's supplemental direct statement exhaustively documents the efforts the trustee expended in reviewing the debtors' financial information in order to ascertain the existence of possible assets.

11. Federal Financial objected to the testimony in the trustee's direct statement regarding her conversations with the debtors' attorney as hearsay. However, it appears that her representation of what she was told by the debtors' attorney would be a statement by a party-opponent under Fed. Evid. R. 801(d)(2)(C) or (D). Regardless, such statements were not offered for the truth of the

matter asserted—in other words, the trustee was not representing that what the debtors' attorney told her was the truth about the debtors' assets or exemption claims. Her primary concern was to demonstrate that the debtors had proffered explanations regarding their exemption claims—explanations which would require additional litigation and additional expense. As such, they are also not hearsay under Fed. Evid. R. 801(c), which provides that an out of court statement is only hearsay when it is "offered in evidence to prove the truth of the matter asserted." Regardless, the trustee's conclusions are not dependent upon these statements but are justified by her exhaustive review of the debtors' financial records.

who assert that bank accounts and other forms of personal property are not held by husbands and wives as "tenants by the entirety." For example, the court in *Beal Bank* states that:

> [I]f the signature card of the account does not *expressly disclaim* the tenancy by the entireties form of ownership, a presumption arises that a bank account titled in the names of both spouses is held as a tenancy by the entireties as long as the account is established by husband and wife in accordance with the unities of possession, interest, title, and time and with right of survivorship. [Emphasis added].

*Id.* at 58. This presumption shifts the burden to the creditor (or in this case, the trustee) to prove that a tenancy by the entireties was *not* created. *Id.* at 58–59.

In short, it appears quite reasonable for the trustee to conclude that the outcome of litigation over the debtors' exemption claims is murky at best. The Court's review of the Florida law on the issue of tenancies by the entirety similarly suggests that the trustee would likely have a difficult time overcoming the presumption in favor of that form of property ownership in this case. It is not the Court's role at this point to actually determine the outcome of that litigation; it is enough to recognize that the probability of success is perhaps best described as "low to moderate," with a significant risk of an adverse outcome. Likewise, the bond appeal relates to an issue which has on two occasions been decided contrary to the position advanced by the trustee. Any further litigation will undoubtedly be complex, document intensive, and generate extensive legal fees and expenses.

Which leads again to the suggestion that as Federal Financial is willing to "fund" the cost of further litigation, the Court should disregard the substantial likelihood that additional litigation will net the estate nothing. Federal Financial has made this suggestion several times before this Court and on appeal. It is true, as the district court noted on appeal, that several cases have indicated that where a creditor is willing to pay "all costs and bear all risks" associated with future litigation, approval of a stipulation contrary to the creditor's wishes may constitute an abuse of discretion. *Reiss*, 881 F.2d at 891–92. Here, however, Federal Financial's representative's statements regarding its commitment to such funding were vague at best and cannot be characterized as a commitment to fully fund future litigation or bear all risks associated with rejection of the settlement proposal.

According to Mr. Donegan, Federal Financial might be willing to fund $100,000.00 in additional legal fees. However, Mr. Donegan was not certain whether Federal Financial was willing to cover the considerable expenses of the trustee or her general counsel which have been incurred to date. In other words, Federal Financial is willing to fund further speculative litigation that it believes has merit, but *only* that litigation and upon its terms. Even then, there is no guarantee that Federal Financial is willing to fund the litigation to its ultimate conclusion no matter how much the cost. Instead, it appears that Federal Financial is unwilling to guarantee much of anything; while it is willing to spend some more money on further litigation, it also reserves the right to decide that the matter has become too expensive and call it quits.

It is entirely likely that further litigation will lead to a weakening of the trustee's negotiating position, at which point the debtors' incentive to settle diminishes even more. It appears that while Federal Financial is willing to "fund" litigation, it is reluctant to cover the trustee's fees and

expenses which would otherwise be paid from the settlement proceeds. If Federal Financial is not willing to assume *all* of the risks associated with releasing the bird the trustee already has in hand, the Court is uncertain what merit to give its desire to pursue the two in the bush while leaving the estate insolvent.[12]

In sum, before the Court is a trustee who has conducted an extensive, exhaustive review of the possible claims against the debtors. The trustee believes that at this point, $400,000.00 is a reasonable settlement offer, especially in light of the trustee's diminished negotiating power. A review of the legal issues surrounding the various claims indicates that the trustee is unlikely to receive a larger amount through litigation, especially when the possibility of significant additional expense is considered. While Federal Financial suggests it is willing to "fund" further litigation, that offer appears somewhat illusory as it is open-ended, allows Federal Financial to terminate funding when it chooses, and promises no security to the trustee or other administrative claimants who would otherwise be paid through the settlement.

Federal Financial invoked the jurisdiction of the bankruptcy court. Federal Financial sought the appointment of the trustee, an independent officer of the court charged with a fiduciary obligation to both the creditor *and* the debtor. That objective third party has proposed a settlement which is eminently reasonable under the circumstances. The complexity of additional litigation, the unlikely prospect of significant additional recovery, and the delays associated with further litigation in a case that has already been pending for almost five years all strongly weigh in favor of approval of the settlement proposal. Against those considerations, there is only the objection of a creditor who has never given the trustee any parameters for what would constitute an acceptable settlement proposal. When considering a settlement proposal, it is the Court's obligation to give "proper deference" to the "reasonable views" of the creditor. In this case, the creditor's views can only be regarded as unreasonable, and cannot override every other consideration in favor of the settlement.

Accordingly, the trustee's motion for approval of the stipulation is granted.

---

12. Indeed, the trustee notes that before the hearing on the cross-motions for summary judgment before Judge Mark, the debtors had proposed to settle these cases for a joint payment of $750,000.00 to the trustee. According to the trustee, Federal Financial rejected the proposal, offered no parameters for counter-proposals, and demanded that the bond litigation continue. Having won before Judge Mark, the debtors clearly felt less incentive to settle with the trustee for a similar amount during the pendency of the trustee's appeal to the district court. The prospects for this estate are rapidly diminishing, and the trustee clearly worries that Federal Financial is playing the part of Nero, fiddling away while Rome burns. Perhaps some of Federal Financial's intransigence is explained by the fact that it acquired its claim as part of a large asset purchase from the Resolution Trust Corporation. Mr. Donegan was unable to tell the Court exactly what Federal Financial paid for the indebtedness as it was part of a package of literally hundreds of other loans, but acknowledged that it was purchased at a fraction of its face value.