**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 08-2408

IN RE 110 BEAVER STREET PARTNERSHIP,

Debtor.

_____

MARTHA JEAN EAKIN, PAUL MCGINTY, JEFF BUSTER,

Appellants,

v.

GOFFE, INC., DUFFY BROTHERS MANAGEMENT CO.,
NORMAN J. DUFFY, ROBERT L. DUFFY, KEVIN DUFFY,
HAROLD MURPHY,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., <u>U.S. District Judge</u>]

Before

Torruella, Ripple,[*] and Boudin, <u>Circuit Judges</u>.

David J. Fine, with whom <u>Law Office of David J. Fine</u>, was on brief for appellants.
John J. Monaghan, with whom <u>Lynn B. Xerras</u>, <u>Diane N. Rallis</u>, and <u>Holland & Knight LLP</u>, were on brief for appellees Goffe, Inc., Duffy Brothers Management Co., Norman J. Duffy, Robert L. Duffy, and Kevin Duffy.

_____

[*] Of the Seventh Circuit, sitting by designation.

Harold B. Murphy, with whom Andrew G. Lizotte and Hanify & King, Professional Corporation, were on brief for appellee Harold B. Murphy.

_____

December 17, 2009

_____

**Per Curiam**.  This is an appeal from the district court's affirmance of a bankruptcy court's order that approved a settlement between the bankruptcy trustee and certain defendants against whom the debtor, 110 Beaver Street Partnership, had asserted legal claims.  The bankruptcy court approved the settlement, and the district court affirmed.  For the reasons set forth in this opinion, we now affirm the judgment of the district court.

## I.  BACKGROUND

### A.

In October 1994, the 110 Beaver Street Trust (the "Trust") purchased land and buildings located at 110 Beaver Street in Waltham, Massachusetts (the "Property") from George W. Moore, Inc. ("Moore").  To finance the purchase, the Trust executed a promissory note payable to Moore in the amount of $850,000.  The note was secured by a mortgage on the Property.  The sole beneficiary of the Trust is an entity called the 110 Beaver Street Partnership (the "Partnership").  Martha Jean Eakin and Paul McGinty (the "Partners") are partners in the Partnership; Jeff Buster is the former trustee of the Trust.  We shall refer to Ms. Eakin, Mr. McGinty and Mr. Buster collectively as the "Principals."

In April 1996, the Duffy Brothers Management Company, owner of a parcel of land next to the Property, filed a proposal with the Waltham Conservation Commission to build a shopping mall on its parcel.  The Trust opposed the proposal on the ground that

the project, if approved, would cause harm to the Property in violation of the Massachusetts Wetlands Protection Act, Mass. Gen. Laws ch. 131, § 40. In July 1996, the Commission nevertheless approved the Duffy Brothers proposal. The Trust then filed an appeal with the Department of Environmental Protection ("DEP"). This appeal had the practical effect of postponing any development until the Trust had exhausted its right to both administrative and judicial review.[1]

On November 13, 1996, Moore commenced foreclosure proceedings on the 110 Beaver Street property. Thirteen days later, Moore sold and assigned the mortgage and the promissory note to Goffe, Inc., a company controlled by the Duffys.[2] In response

_____

[1] In August 1996, Mr. Buster and three other individuals also filed an action in Superior Court in which they alleged that the Commission's approval of the project violated the state's open meeting law.

[2] The facts found by the Superior Court, in the proceeding that shall be discussed later in the text, provide a more complete picture of this episode. They reveal that in August 1996, the Duffys learned that the 110 Beaver Street property was "in trouble." Buster v. George W. Moore, Inc., No. 97-637-F, 2000 WL 576363, at *8 (Mass. Super. Apr. 28, 2000). They investigated the situation, discovering that Mr. Buster was in default on Moore's note and that real estate taxes had not been paid for roughly two years. Id. At the end of October, one of the Duffys called Moore for the first time to discuss purchasing the note. Id. at *9. Later, the Duffys began to insist that Moore commence foreclosure proceedings before the sale. Id. Moore was resistant, but the disagreement became moot when the parties learned that Sherburne, Powers & Needham, the law firm that had represented both the Duffys and Moore but was not representing either of them in this transaction, had already filed a complaint to foreclose the mortgage in Moore's name. Id. at *10. The Superior Court found that the Duffys had paid the law firm to prepare the foreclosure

- 4 -

to the foreclosure, Mr. Buster filed an action in Massachusetts Superior Court, to which the other Principals were later joined. The complaint in this action alleged two sets of claims relevant to this discussion. It alleged that Goffe had undertaken the foreclosure to prevent the Principals from exercising their First Amendment right to petition by prosecuting the DEP appeal (the "Civil Rights Claims"), and that Moore had refused to remove its inventory from the Property in a timely manner (the "Storage Claims"). See R.App. 791-801.

Once they had taken ownership of the mortgage through Goffe, the Duffys met with the Principals and offered to allow them to deed the Property in lieu of foreclosure or to negotiate a forbearance. Buster v. George W. Moore, Inc., No. 97-637-F, 2000 WL 576363, at *11 (Mass. Super. Apr. 28, 2000). Both options required, however, that the Principals withdraw the DEP appeal and dismiss the Superior Court action. The Principals refused.

**B.**

Goffe then scheduled a foreclosure sale for February 1997. However, on the day of the sale, the Partnership filed a petition in the United States Bankruptcy Court for the District of

---

papers, but that the actual filing was the result of a miscommunication within the firm. Id. In any case, once the papers had been filed, nothing stood in the way of the transfer of the note to Goffe. The Superior Court found that the Duffys's primary motivation in this purchase was to induce Mr. Buster to withdraw his DEP appeal and open meeting law action. Id. at *14.

- 5 -

Massachusetts, seeking relief under Chapter 11 of the Bankruptcy Code. The commencement of this bankruptcy action triggered the automatic-stay provision of 11 U.S.C. § 362(a), barring Goffe from proceeding with the foreclosure sale.

In April 1997, Goffe, hoping to foreclose on the Property, moved for relief from the automatic stay. It argued that, because there was no equity in the Property and the Property was not necessary for effective reorganization, relief from the stay was justified under 11 U.S.C. § 362(d)(2).[3] R.App. 57. Goffe also argued that the Partnership had violated zoning, environmental and building regulations, which threatened the insurability, marketability and value of the collateral, justifying relief under 11 U.S.C. § 362(d)(1). R.App. 61, 64.

On May 30, the Duffys met with the Mayor of Waltham and told him that they believed that there were safety violations at 110 Beaver Street. Subsequently, a comprehensive fire inspection

---

[3] 11 U.S.C. § 362(d) provides in pertinent part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
(2) with respect to a stay of an act against property under subsection (a) of this section, if--
(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization[.]

of the Property took place. The violations uncovered were sufficiently serious to result in the issuance of a cease and desist order. Buster, 2000 WL 576363, at *14; In re 110 Beaver St. P'ship, 244 B.R. 185, 189 (Bankr. D. Mass. 2000); R.App. 256.[4]

Shortly thereafter, the Partnership and Goffe entered into an agreement that would have put in place a Goffe-supported reorganization plan, released the Principals from any liability on the note and released all claims against Goffe. Mr. Buster signed the agreement on behalf of the Principals, but then subsequently opposed it. Mr. Buster claimed that the agreement was "done under duress," R.App. 383, and involved risk, R.App. 384. When asked by the court to identify the aspect of the agreement with which he disagreed, Mr. Buster responded only that "it says something to the tune of 'not then perform.'" R.App. 385. The bankruptcy court characterized these complaints as "vague and unintelligible." R.App. 428. The court approved the settlement and appointed a bankruptcy trustee, Harold B. Murphy, who filed a motion to compel the Principals to comply with the agreement. R.App. 820-24.

At a hearing on the motion in October 1997, the court said, "I think the settlement is a good one," but nevertheless concluded that, in light of Mr. Buster's "absolutely outrageous"

---

[4] The Superior Court found that the primary motivation of the Duffys in their meeting with the Mayor was to "trigger administrative action by the City of Waltham that would strengthen their argument for lifting the automatic stay[.]" Buster, 2000 WL 576363, at *17.

conduct, the cost of enforcing the settlement would be too high to justify. Rather than enforce the settlement, the court opted to grant Goffe relief from the automatic stay. The court stated that Goffe was entitled to such relief "because it [Goffe] lacks adequate protection due to the fact that the property has been the subject of cease and desist orders by the City of Waltham which impair, potentially seriously hurt Goffe's ability to realize on its collateral." R.App. 451-52. The court's action allowed the foreclosure sale to proceed, and the Property was sold in 1998 for approximately $1.3 million.[5] Also in 1998, the bankruptcy case was converted to Chapter 7. Beaver St., 244 B.R. at 190.

After his appointment, Trustee Murphy took up the prosecution of the Superior Court action as well as two additional claims: that Goffe had violated the automatic stay by informing Waltham officials of code violations at the Property (the "Stay Claim"), and that Goffe had overstated its claim to the foreclosure proceeds (the "Proceeds Claim").

The year 2000 was a significant year for this case. First, the bankruptcy court declined to approve a settlement that Trustee Murphy had reached with Goffe. The court believed that the compromise was deficient with respect to all of the claims that we have mentioned. Second, following that rejection, the Civil Rights

---

[5] The Partnership had claimed that the fair market value of the Property was $1.1 million. R.App. 364.

Claims were tried in Superior Court, and the court found no liability. Buster, 2000 WL 576363, at *27. The decision was affirmed subsequently by the Supreme Judicial Court. Buster v. George W. Moore, Inc., 783 N.E.2d 399, 403 (Mass. 2003). Consequently, only the Stay Claim, the Storage Claim and the Proceeds Claim remained unresolved.

## C.

After quite a few years with little significant activity, in 2007, Trustee Murphy and Goffe negotiated the settlement at issue in this case. The settlement resolved the Proceeds Claim, the Storage Claim and the Stay Claim--the last remaining assets of the estate--for $125,000. R.App. 598, 612-16. The Principals opposed the settlement. They also asked the bankruptcy court for an evidentiary hearing on their allegation that Goffe had violated the automatic stay.

The court held that the settlement was reasonable. It noted that, in light of the resolution of the Civil Rights Claims by the Supreme Judicial Court of Massachusetts and the accrual of increased legal fees, the Partnership's prospects of recovering significantly more than the settlement amount were "at best, very uncertain." Appellant's Addendum 13-14. Also, continued litigation would involve additional expense, inconvenience and delay. Id. The court also pointed out that no non-insider creditor had voiced any objection to the settlement, and that

"where[, as here,] administrative and non-insider unsecured claims will not be fully paid, the interest of the principals is more attenuated than before[.]" Id. The court also denied the Principals' motion for an evidentiary hearing on the Stay Claim, saying that "[l]itigating causes of action to assess their outcome is precisely what the reasonableness standard for compromises is intended to avoid." Id.

Following the approval of the settlement, the Principals filed an adversary complaint in the bankruptcy court. The complaint outlined the Duffys's alleged violation of the automatic stay and attempted to frame the Duffys's conduct as a broader pattern of wrongdoing: fraudulently obtaining the cease and desist orders, failing to disclose their conduct to the court and using the orders to argue impairment of their collateral, "when the real reason they wanted to foreclose was to silence the Debtor's petitioning activities[.]" R.App. 1209-10. The complaint sought monetary sanctions pursuant to 11 U.S.C. § 105(a) and the bankruptcy court's inherent powers. The district court dismissed this complaint sua sponte. R.App. 1172.

The Principals appealed the bankruptcy court's decisions to the district court, which affirmed. They now appeal to this court.

## II. DISCUSSION

### A.

In reviewing this matter, we must confine ourselves to the same record that was before the bankruptcy court and the district court. We review independently the bankruptcy court's determination. With respect to that court's findings of fact, we apply the clearly erroneous standard; with respect to its conclusions of law, we apply a de novo standard of review. Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995). Our case law establishes that, in deciding whether to accept a compromise proposal that discharges legal claims held by the debtor, the bankruptcy court should consider the following factors:

> (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

Id. at 185. In applying these factors, the trustee is accorded a significant range of discretion in the prudent exercise of business judgment. We also must keep in mind the general principle that "compromises are favored in bankruptcy." In re Mailman Steam Carpet Cleaning Corp., 212 F.3d 632, 635 (1st Cir. 2000) (internal quotation marks and citation omitted). Consequently, our task is to determine whether the settlement meets the "lowest point in the

- 11 -

range of reasonableness." In re Healthco Int'l, 136 F.3d 45, 51 (1st Cir. 1998) (internal quotation marks and citation omitted).

The Principals's opening brief in this court makes no focused argument with respect to the Proceeds Claim and the Storage Claim. Accordingly, these issues are waived. See Playboy Enters. v. Pub. Serv. Comm'n of Puerto Rico, 906 F.2d 25, 40 (1st Cir. 1990) ("An appellant waives any issue which it does not adequately raise in its initial brief[.]"). The brief provides scant information, and it is not our role to make arguments not presented by the parties at the appropriate time. Suffice it to say that the Principals would be hard-pressed to show that these claims would add value to the estate, given the very significant administrative expenses amassed during the course of these bankruptcy proceedings.

There is substantial reason to believe that the Partnership would not prevail on the Stay Claim. In In re McMullen, 386 F.3d 320, 328 (1st Cir. 2004), we held that, for public policy reasons, courts should be circumspect about construing a "private party's reporting of wrongful conduct to governmental regulatory authorities" as a violation of the automatic stay. The Principals seek to distinguish McMullen by claiming that it does not apply in cases of bad faith. However, even if the Principals were successful in proving bad faith (and it is clear that proving this point would be a substantial undertaking), we have expressed skepticism in both McMullen and In

re Spookyworld, Inc., 346 F.3d 1 (1st Cir. 2003), that an allegation of bad faith makes any difference in the valuation process. In Spookyworld, for example, we expressed concern that inquiring into the legitimacy of the regulatory claims would mire the bankruptcy courts in "mini-trials of purely state regulatory issues." Id. at 10 (internal quotation marks and citation omitted). In McMullen, we cited Spookyworld in noting "the tenuousness of the arguments for engrafting such a 'bad faith' exception . . . noting the emergent rule that bankruptcy courts should not inquire into the legitimacy of ongoing administrative enforcement proceedings in determining whether the police power exception applies to them." 386 F.3d at 328 (internal quotation marks and citation omitted).

Moreover, even if the Partnership prevailed on this claim, it is questionable whether it would be able to collect much in the way of damages. See 11 U.S.C. § 362(k)(1);[6] Spookyworld, 346 F.3d at 7 (holding that a debtor that is a corporation cannot sue under § 362(h) for a violation of the automatic stay). Furthermore, any recovery likely would be offset by the fees and costs incurred in pursuing litigation.[7]

---

[6] Before recent amendments to the Bankruptcy Code, the relevant provision appeared as § 362(h).

[7] We also note that it would have been very difficult for the Principals to argue that this case is controlled by our decision in In re Lloyd, Carr & Co., 617 F.2d 882 (1st Cir. 1980). In Lloyd, Carr, we held that "where . . . a settlement rewards a bankrupt for

The fourth prong of the <u>Jeffrey</u> analysis requires that the bankruptcy court recognize "the paramount interest of the creditors and a proper deference to their reasonable views in the premise." 70 F.3d at 185. Notably, none of the non-insider creditors objected to the settlement, which provided a payment of thirty-two cents on the dollar to the unsecured creditors. Had the Trust been required to litigate these claims, there is a good

_____

his contumacious refusal to comply with the Bankruptcy Act itself, more is required than a simple showing of marginal benefit. Public policy forbids a settlement of this character without, at least, a powerful showing of such potential detriment to the estate that no other course is reasonably available." <u>Id.</u> at 891. The debtor, who was being held on charges of fraud in the sale of stock options, had stashed $1.75 million in banks in Bermuda. The bankruptcy court ordered him to have those funds transferred to an American bank and placed under the control of a receiver. The debtor refused to comply with the court's order and in fact strenuously resisted attempts in Bermudan courts to have the funds transferred to the United States. After its attempts to obtain the money by other means were thwarted, the receiver reached a settlement with the debtor. The agreement called for the debtor to transfer $207,000 from Bermuda to the United States. Half of that money would go to the receiver; the debtor would retain the other half and would use it to post bail. All of the major creditors opposed this proposed settlement. The district court nevertheless approved the settlement, but we reversed. We noted that the debtor was required by law to transfer the money even in the absence of the agreement; thus, he provided no consideration for the agreement. <u>Id.</u> at 890. We further concluded that the bankruptcy code did not permit the disbursement of funds from the bankruptcy estate to allow a debtor to post bail. <u>Id.</u> at 889. We also noted that the compromise had been actively opposed by the major creditors and affirmatively approved by none. <u>Id.</u> at 892. In sum, we held that the agreement was contrary to public policy because the debtor would give up nothing and would get a benefit to which he was not legally entitled.

Here, by contrast, the allegations involve alleged wrongdoing by a third party and, as we have shown, it may well be that a trier of fact would not decide that there was a showing of bad faith.

- 14 -

chance that these creditors would have received a great deal less, assuming there had been some recovery. In that respect, we give substantial deference to a bankruptcy court's decision to approve a proposed settlement.

The Principals, therefore, have not carried their burden of showing that the bankruptcy court's determination falls below the bottom of the range of reasonableness. Even if the claims have merit, the amount that the Trust might collect is so uncertain as to make the bankruptcy court's decision to approve the settlement reasonable. We have no difficulty in determining that the judgment of the trustee was well within the range of reasonableness and that the bankruptcy court correctly approved the settlement. The strength of the Partnership's remaining claims was indeed questionable, and the offer of settlement approved by the bankruptcy court was a very realistic one.

**B.**

In its ruling on the motion to reconsider approval of the settlement, the bankruptcy court dismissed <u>sua</u> <u>sponte</u> an adversary complaint filed by the Principals. Its discussion of the matter was brief:

> The partners' rights (including any rights of the 110 Beaver Street Trust) to relief in the adversary proceeding are subject to the terms of the settlement, which was approved before the filing of the adversary proceeding. Moreover, the demands for relief in the adversary proceeding are predicated entirely on rights of the debtor and of the bankruptcy

- 15 -

> estate, which rights have now been settled by
> the agreement. Therefore, the adversary
> proceeding too must be dismissed.

R.App. 1172.

A <u>sua</u> <u>sponte</u> dismissal "without prior notice to plaintiff may be proper in relatively egregious circumstances." <u>Martinez-Rivera</u> v. <u>Sanchez Ramos</u>, 498 F.3d 3, 7 (1st Cir. 2007). In such cases, it is "crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile[.]" <u>Gonzalez-Gonzalez</u> v. <u>United States</u>, 257 F.3d 31, 37 (1st Cir. 2001). These cases have "incurable defects that are evident from the face of the complaint - <u>e.g.</u>, claims based on indisputably bogus legal theories or delusional factual scenarios." <u>Green</u> v. <u>Concord Baptist Church</u>, No. 08-1977, 2009 WL 580813, at *2 (1st Cir. Mar. 9, 2009) (citing <u>Martinez-Rivera</u>, 498 F.3d at 7-9).

When a partnership enters bankruptcy, the partnership's claims become property of the bankruptcy estate, and the partners may not bring them.[8] Acknowledging this rule, the Principals

---

[8] <u>See</u> <u>In re Seven Seas Petroleum, Inc.</u>, 522 F.3d 575, 584 (5th Cir. 2008) ("If a claim belongs to the estate, then the bankruptcy trustee has exclusive standing to assert it."); <u>DiMaio Family Pizza & Luncheonette, Inc.</u> v. <u>Charter Oak Fire Ins. Co.</u>, 448 F.3d 460, 463 (1st Cir. 2006) ("'[A]ll legal or equitable interests...in property as of the commencement of the case' and 'any interest in property that the estate acquire[d] after the commencement of the case' became the property of their respective bankruptcy estates" and "their bankruptcy trustees acquired exclusive standing to assert those claims.") (quoting 11 U.S.C. § 541(a)(1),(7)); <u>In re Pentell</u>, 777 F.2d 1281, 1285 (7th Cir. 1985) (stating that partnerships are "separate 'persons' for purposes of the Bankruptcy Code"); <u>Turner</u> v. <u>Cent. Nat'l Bank of Mattoon, Ill.</u>,

- 16 -

submit that they are asserting claims that are "different and distinct" from those resolved by the settlement, Appellant's Br. 35, and predicated on a "different and distinct" factual and legal basis. Appellant's Br. 38. On the basis of our own review of the complaint, we cannot accept this argument. The complaint presents a fundamental problem on its face that makes clear the correctness of the bankruptcy court's decision. The complaint simply does not state a claim for damages that is separate, as a matter of fact and law, from damage to the Partnership. The Principals's allegations, as well as their arguments in their briefs, make clear that whatever injury they <u>might</u> be able to show would constitute injury

<hr />

468 F.2d 590, 591 (7th Cir. 1972) (per curiam) (noting that "for bankruptcy purposes partnership property is to be distinguished from property of the individual partners"); <u>Thomasson</u> v. <u>Mfrs. Hanover Trust Co.</u>, 657 F.Supp. 448, 452 (S.D. Tex. 1987) ("If the claims do in fact remain partnership claims, when the partnership is also, as it is here, the debtor in bankruptcy, those claims would be property of the estate, and Plaintiffs would be unable to assert them."); <u>In re Hopkins</u>, 346 B.R. 294, 304 (Bankr. E.D. N.Y. 2006) ("Moreover, courts have consistently held that only the trustee and not a debtor has standing to pursue causes of action that belong to the bankruptcy estate."); <u>In re Gainesville Venture, Ltd.</u>, 159 B.R. 810, 811 (Bankr. S.D. Ohio 1993) ("When the limited partnership is a chapter 11 debtor, however, any causes of action or defenses of the limited partnership...are property of the partnership's bankruptcy estate[.]"); <u>In re Equidyne Props., Inc.</u>, 60 B.R. 245, 248 (Bankr. S.D. N.Y. 1986) ("Thus the Partnerships, not the [limited partners], appear to be the holders of the claims the [partners] assert. Accordingly, it would appear to be the province of the trustee or someone authorized to act on the estate's behalf to pursue the claims against the general partner."); <u>see also</u> 4 William L. Norton, Jr. & William L. Norton III, <u>Norton Bankr. L. & Prac.</u> 3d § 61:4 (2009) ("Code § 541(a)(1) includes every conceivable interest of the debtor in the estate[.]"); <u>id.</u> § 61:1 ("[T]he estate includes all property of the debtor[.]").

to the Partnership. Such alleged injuries suffered by the Partnership are precisely the matters that were compromised by the settlement agreement.[9]

## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

**Affirmed**.

---

[9] We are aware that the Court of Appeals for the Fifth Circuit has held explicitly that a creditor has standing to bring an action for damages under 11 U.S.C. § 362(k) for a violation of the automatic stay provision. See St. Paul Fire & Marine Ins. Co. v. Labuzan, 579 F.3d 533 (5th Cir. 2009). However, as that case makes clear, the creditor must be able to allege an injury as a creditor from the violation of the automatic stay. Here, the plaintiffs can allege no injury to themselves; they simply allege an injury to the partnership estate.